## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAMSTER MEMBERS RETIREMENT PLAN f/k/a GCIU INTER-LOCAL PENSION PLAN, Individually and On Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ALLIANZ GLOBAL INVESTORS U.S. LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., and PFP HOLDINGS INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Teamster Members Retirement Plan f/k/a GCIU Inter-Local Pension Plan ("Plaintiff"), individually and on behalf of all others similarly situated, for its Complaint against Defendants Allianz Global Investors U.S. LLC ("AllianzGI"), the Allianz Group Defendants (defined fully below), Allianz of America, Inc., and Allianz SE (collectively, "Defendants"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This is a case about how Defendants' breaches of contract, violations of fiduciary duty, and other knowing and reckless (or at least negligent) acts and omissions led to the collapse of a hedge fund and the evaporation, almost overnight, of almost a billion dollars of its investors' money.

2.     Defendant AllianzGI is the Managing Member of Structured Alpha US Equity 500 LLC (the "Fund"), a hedge fund that it and the other Allianz Group Defendants developed, marketed, and managed as a "return enhancement" fund whose goal was to outperform theStandard and Poor's 500 Composite Stock Index (the "S&P 500 Index" or "S&P 500") by 500 basis points (*i.e.*, 5%) each year, net of fees and expenses.  In its offering documents and marketing materials for the Fund, AllianzGI assured investors that the Fund's investment strategy was "designed to outperform whether equity markets are up or down, smooth or volatile" and that Fund assets would be "protect[ed] against a market crash" by a sophisticated "hedging" strategy.  Indeed, in 2020 – just weeks before the Fund imploded – AllianzGI specifically assured the Fund's investors that the Fund was "as prepared as ever in the event of a severe market dislocation" and that the Fund was actually "***positioned for a strong improvement***" in the event of a "violent correction and volatility surge" of the type that had occurred two years earlier in February 2018 (when the S&P 500 Index had fallen sharply and market volatility had spiked over the course of a two week period).[1]

3.     In late February and early March 2020, equity markets did, in fact, experience another "violent correction and volatility surge" that was remarkably similar to what had occurred two years earlier in February 2018.  However, far from being "positioned for a strong improvement" in this scenario, the Fund was actually positioned for catastrophic disaster – and instead of prudently managing the Fund to "protect [investors] against a market crash" as increasingly volatile markets continued to decline, Defendant AllianzGI essentially: (i) abandoned the Fund's risk controls and meaningful downside hedging strategies; and (ii) recklessly "rolled the dice" in the hope that adverse market trends would quickly reverse course before the Fund

---

[1]     Unless otherwise stated, all emphasis in quoted materials is added.

would have to recognize devastating losses.  AllianzGI's reckless throw of the dice in the late winter of 2020 – and its abject failure to meaningfully "re-balance" its "market neutral" positions or acquire more than token hedge positions (despite having had plenty of time to do so) – proved to be a fool's bet **and resulted in catastrophic losses of over 75%** for the Fund's investors.

4.      It appears that AllianzGI's extreme risk taking – to the extent it was not the product of mere recklessness, negligence, and incompetence – was motivated by the incentives created by the Fund's fee structure.  Under the Fund's fee structure, the ***only*** fee that AllianzGI (as the Fund's managing partner) could collect from Fund investors was an "incentive allocation" fee equal to 30% of the amount (the "alpha returns") by which the Fund outperformed the S&P 500 Index.  (As further described below, the Fund purchased futures contracts on margin to mimic the returns of the S&P 500 Index, and then used its remaining excess cash to acquire options positions that would generate "alpha" returns in excess of the Fund's S&P 500-based "beta returns").  The Fund's fee structure also included what AllianzGI referred to as a "cumulative high water mark" feature, which provided that if an investor's account were to underperform compared to the S&P 500, that investor would not owe ***any*** more fees to AllianzGI until the value of that investor's account returned to, and increased above, its previous "high water mark."

5.      Unfortunately for investors, as the events of late February and March 2020 played out, the Fund's fee structure put AllianzGI in an increasingly conflicted position because, as markets continued to move against the Fund's positions (and as the costs of meaningfully reducing the Fund's risk exposure to prudent levels increased with each passing day), by early March 2020, the paper losses already incurred by the Fund (though not yet anywhere remotely near the 75% level) meant that it would likely be at least a year before the Fund's value would bounce back to its previous "high water mark" and allow AllianzGI to collect fees again.  Accordingly, rather than

lock in relatively small losses to "protect [investors] against a market crash," in the late winter of 2020, AllianzGI was instead incentivized to recklessly gamble – *with its investors' money* – that a favorable and prompt change in the investment winds would save the Fund and put the Fund's portfolio back into the profitable territory without incurring the costs of meaningful re-balancing and hedging efforts. Taking such a reckless gamble with its *investors'* money may have been the best risk-adjusted option *for AllianzGI* to take (since Allianz would maximize its ability to continue to collect lucrative incentive fees going forward if markets quickly reversed course) – but, predictably, it left the Fund increasingly exposed to catastrophic losses. By the end of March 2020, the Fund's investors had lost *over 75%* of their money – or nearly $1 *billion*.

6.     Through this action, Plaintiff seeks, on behalf of itself and all others similarly situated, to recover the damages caused by AllianzGI's breaches of its contractual and fiduciary duties to Fund investors, its negligence, and its knowing, reckless, or at least negligent misrepresentations and omissions to the Fund's investors.

## THE PARTIES

7.     Plaintiff Teamster Members Retirement Plan f/k/a GCIU Inter-Local Pension Plan is a 501(c)(18) employee-funded defined benefit plan with its principal place of business in Carol Stream, Illinois.

8.     Defendant AllianzGI is a Delaware limited liability company with its principal place of business at 1633 Broadway, 43rd Floor, New York, New York 10019. AllianzGI is registered as an investment adviser under the Investment Advisers act of 1940. As the Managing Member of the Fund, AllianzGI directly controlled the Fund at all relevant times and communicated directly with the Fund's investors regarding the investment portfolio, its performance, its risk controls, and other essential information. AllianzGI is a direct, wholly owned subsidiary of Allianz Global Investors U.S. Holdings LLC (defined below).

4

9.      Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.  AllianzGI Holdings is the direct 100% owner of AllianzGI.

10.      Defendant Allianz Asset Management of America L.P. ("Allianz AMA LP") is a Delaware limited partnership with its principal place of business in Newport Beach, California. Allianz AMA LP is the direct 100% owner of AllianzGI Holdings.

11.      Defendant Allianz Asset Management of America LLC ("Allianz AMA LLC") is the sole general partner of Allianz AMA LP and a Delaware limited liability corporation with its principal place of business in Newport Beach, California.

12.      Defendant PFP Holdings Inc. ("PFP"), a limited partner of Alliance AMA LP, is a corporation incorporated in Delaware with its principal place of business in Newport Beach, California.

13.      Defendant Allianz Asset Management of America Holdings Inc. ("Allianz AMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California.  Allianz AMA Holdings holds a 0.1% managing equity interest in Allianz AMA LLC (the remaining 99.9% equity interest in Allianz AMA LLC is owned by Defendants Allianz of America and AAM GmbH (both defined below), but those entities hold no managing equity interest in Allianz AMA LLC).

14.      Defendants AllianzGI, AllianzGI Holdings, Allianz AMA LP, Allianz AMA LLC, PFP, and Allianz AMA Holdings are part of what Defendants branded and marketed as "Allianz Global Investors" – the Allianz Group's (defined below) global asset management business – and are sometimes referred to collectively herein as the "Allianz Group Defendants."

15.     Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany that provides asset management services to 82 million clients in over 70 countries.  Allianz SE refers to itself and its subsidiaries as the "Allianz Group."  Allianz SE holds a direct nearly 75% interest in AMA GmbH and an indirect 100% interest in Allianz of America.  According to the Allianz SE statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services."  Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision, and risk management of the Fund, as marketed and sold to Plaintiff and members of the Class (defined below).

16.     Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Novato, California, that holds a 99.8% equity, but non-managing, interest in Allianz AMA LLC.  Allianz of America is a wholly owned indirect subsidiary of Allianz SE.

17.     Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany, and is the asset management division of Allianz SE.  AAM GmbH is the direct 100% owner of Allianz AMA Holdings and holds a 0.1% non-managing interest in Allianz AMA LLC.  In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz asset management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Fund through the operation of Allianz Global Investors, which AAM GmbH controlled at all times relevant hereto.  Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was

responsible for the sale, marketing, operation, and risk management of the Fund sold to Plaintiff and Class members.

18. The personnel and operational overlap of the above Defendants establishes the principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and unilateral reporting structure. For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous overlapping directors and executives, as well as the same business address and phone number with AllianzGI. Specifically, Gemesh Pushpaharan is both the Chief Operating Officer ("COO") and Managing Director of AllianzGI, and a member of the Executive Committee of AllianzGI Holdings. Paul Koo is both the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings. As such, he executed AllianzGI's Forms 13G filed with the U.S. Securities and Exchange Commission on behalf of both AllianzGI and AllianzGI Holdings.

19. Further, the following individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen; John Carroll; David Jobson; Erin Bengtson-Olivieri; Christopher Cieri; Joseph Quirk; Steven Ricci; Frank Garofalo; Bruce Goodman; David Hood; Douglas Forsyth; Peter Bonanno; and Joseph Scull.

20. Further establishing the common control and management of these entities, AllianzGI, AllianzGI Holdings, Allianz AMA LP, Allianz AMA LLC, Allianz AMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including the following:

- John Maney: COO and Managing Director of Allianz AMA LP and Allianz AMA LLC and Managing Director of AllianzGI;

- James Funaro: Senior Vice President ("SVP") of AllianzGI, Allianz AMA LP, Allianz AMA LLC, Allianz AMA Holdings, and AllianzGI Holdings and SVP of Tax Matters for PFP;

- Tony Burg: SVP and Treasurer of AllianzGI, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and AllianzGI Holdings;

- Kellie Davidson: Secretary of AllianzGI, Allianz AMA LLC, and Allianz AMA LP and Assistant Secretary of Allianz AMA Holdings and AllianzGI Holdings;

- Tucker Fitzpatrick: SVP and Secretary of Allianz AMA Holdings, SVP and General Counsel of Allianz AMA LP, and Assistant Secretary of AllianzGI Holdings and Allianz GI;

- Michael Puntoriero: Chief Financial Officer ("CFO") of Allianz AMA Holdings, AllianzGI Holdings and Managing Director and CFO of AllianzGI, Allianz AMA LLC, Allianz AMA LP, and PFP;

- Vinh Nguyen: SVP and Treasurer of AllianzGI, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and PFP;

- Colleen Martin: SVP and Controller of AllianzGI, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and PFP; and

- John Viggiano: Managing Director and US General Counsel with Allianz Global Investors, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

21.     These overlapping relationships among Defendants' employees, officers, and directors are consistent with Allianz Global Investors' branding, and Allianz SE's corporate filings explain the important role the ultimate parent company (Allianz SE) plays in establishing and enforcing the risk framework and procedures that failed in the case of the Fund.  For example, Allianz SE's Board of Directors ("Board") is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group."  Board members of both Allianz SE and the Allianz Group sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines."  According to those filings, Allianz

Group runs its "operating entities" – including the Defendant subsidiaries here that comprise its asset management division – "via an integrated management and control process," which includes Allianz Group's review of the operating entities' "business strategies and goals."

22.     Allianz SE acknowledges that it exercises controlling power over each of the other Defendants and relies on their business activities in assessing its own solvency under applicable European insurance regulations.  Specifically, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts and solvency calculation of each of Defendants AllianzGI, AllianzGI Holdings, Allianz AMA LP, PFP, Allianz AMA LLC, Allianz AMA Holdings, and AAM GmbH – confirming the ultimate control Allianz SE exerts over the Allianz Group Defendants.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §1332(d)(2)(A) because this case is a class action in which the aggregate claims of all Class members exceed $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state different from any of the Defendants.

24.     Venue is proper in this District under 28 U.S.C. §1391(b) because the actions that AllianzGI and the other Defendants undertook in managing the Fund took place in this District. In addition, AllianzGI has consented to the jurisdiction of this Court in Article VI of the Subscription Agreement between Plaintiff and AllianzGI, dated August 20, 2013, which provides that "in the event of any dispute arising out of the terms and conditions of this Subscription Agreement, the parties hereto consent and submit to the jurisdiction of the courts of . . . the U.S. District Court for the Southern District of New York."

9

## FACTUAL BACKGROUND

**I.      The Nature of the Fund, AllianzGI's Representations to Investors, and AllianzGI's Contractual and Fiduciary Duties to Plaintiff and the Class**

25.      Investors in the Fund, including Plaintiff, were required to execute a Subscription Agreement, which incorporated the terms of (i) a Limited Liability Company Agreement (the "LLC Agreement"); and (ii) a Confidential Private Placement Memorandum (the "PPM") (collectively, with the LLC Agreement and Subscription Agreement, the "Offering Documents").

26.      The LLC Agreement provided that AllianzGI would serve as the "Managing Member" of the Fund.  As Managing Member, AllianzGI was authorized to "conduct the day-to-day administration" of the Fund, had "the power on behalf and in the name of the [Fund] to carry out any and all of the objects and purposes" of the Fund, and to "perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto."

27.      The LLC Agreement also appointed AllianzGI as the "investment manager" of the Fund.  As investment manager, AllianzGI's duties included, among other things, "advising regarding the purchase and sale of investments" and "managing the Company's [*i.e.*, the Fund's] assets."

28.      Under the LLC Agreement, AllianzGI, as Managing Member, may be held liable to the Fund's investors (or "Members") for "any acts or omissions arising out of or in connection with the [Fund]" that are "made in bad faith" or that constitute "willful misconduct or negligence."

29.      As set forth in the PPM, the Fund's stated objective was to outperform the S&P 500 Index by 5% per year, net of fees and expenses (or 7.5% per year on a gross basis).

30.      As the Fund's Managing Member, AllianzGI represented in the PPM and its other marketing materials that it would seek to accomplish these performance goals by engaging in a

two-pronged investment strategy that would include two basic components: a "beta" component; and an "alpha" component.

###    A.    The Beta Component of AllianzGI's Investment Strategy

31.    The Fund's "beta" component consisted of investments in the S&P 500 via futures contracts on the S&P 500.  In general, a futures contract ***requires*** the buyer of the contract to purchase (i) a specified asset (and ***requires*** the seller to sell that asset), (ii) on a specified, predetermined future date, (iii) at a specified predetermined price.  S&P 500 futures contracts, which track the prices of the stocks that make up the S&P 500 Index, are some of the most liquid and most traded futures products in the world, with approximately 1.5 to 2.0 million contracts (with a notional value of over $250 billion) trading per day.  S&P 500 futures differ from the above general description because they are cash-settled (as opposed to futures in certain commodities, like oil, which are contracts for physical delivery).[2]  S&P 500 futures are listed on the Chicago Mercantile Exchange ("CME") and also trade on virtually a 24-hour basis on the CME Globex exchange from Sunday afternoon through Friday afternoon (Chicago time).  According to the CME's website, the CME's "E-mini S&P 500 futures contract" (ticker symbol "ES") is "one of the most liquid futures contracts in the world and one of the most efficient and cost-effective ways to gain market exposure to the S&P 500 index."[3]

---

[2]    Industry participants created the cash-settlement mechanism to resolve the logistical challenges that would be presented by requiring a contracting party to actually deliver shares of the 500 stocks associated with a S&P 500 futures contract.  Not only would the shares have to be negotiated and transferred between holders, but they would have to be properly weighted to match their representation in the S&P 500 Index.  Instead, an investor in S&P 500 futures effectively takes a long or short position, which can then be readily and continuously valued based on the prices of the component stocks in the S&P 500 Index.  Eventually, the contract expires, or is offset, and becomes cash-settled based on the spot value of the S&P 500 Index.  S&P 500 futures expire quarterly, on the last trading day of the months of March, June, September, and December.

[3]    The "e-mini" S&P 500 futures contract is one-fifth the size (and hence one-fifth the cost) of the so-called "big contract."  Although the "big contract" was for many years the standard size for an S&P 500 futures contract, today the "e-mini S&P 500 futures contract" is now the most widely traded size, even among most institutional traders.

32.     In the PPM, AllianzGI stated that the Fund would not "borrow money to make investments," but that it would "engage in operational leverage by using the underlying investments of the [Fund's] Beta Component as collateral in pursuit of its Alpha Component." AllianzGI also stated that this "operational leverage" would result from "the low margin deposits required in futures and options trading and in trading certain other financial instruments." In other words, because the S&P 500 futures that would form the basis of the Fund's "beta" component would be purchased "on margin" – that is, in exchange for a fraction (or "margin") of the total contract value – the Fund would have substantial additional amounts of investor capital, which AllianzGI could then invest to fund the strategy's "alpha" component. At the same time, by buying a portfolio of S&P futures that was heavily financed on margin, the Fund could achieve far greater "long" exposure to the S&P 500 Index (for better or worse) than it could have achieved if the Fund simply bought, for example, non-leveraged mutual fund shares or ETF shares that replicate the performance of the S&P 500 Index.

**B.      The Alpha Component of AllianzGI's Investment Strategy**

33.     As for the "alpha" component of AllianzGI's investment strategy for the Fund, AllianzGI represented in the PPM and its marketing materials that the Fund would generate profits from making "investments in puts and calls on equity indices," which would be structured to "create option-based profit zones."

34.     "Puts" and "calls" are types of option contracts (or "options"), which are contracts that give the purchaser of the option the right (but not the obligation) to buy or sell an underlying asset, at a fixed price, on or before a specified future date. Options (like futures) are a basic species of "derivatives" – financial instruments that derive their value from their underlying assets. The underlying assets can include, among other things, stocks, exchange-traded funds, fixed-income

products, foreign currencies, or commodities – or, as here, the value represented by a major stock index, such as the S&P 500 Index.

35.     In exchange for an upfront cash payment (referred to as a "premium"), the purchaser of a put or call option buys the *right* to buy (in the case of a call) or to sell (in the case of a put) an instrument during a specified time period at a *fixed* "strike price," regardless of the extent to which the price of the underlying security (or index) rises or falls during the term of the contract.  Conversely, the seller (or "writer") of an option contract receives an upfront, irrevocable cash premium payment, but has an *obligation* to sell (in the case of a call) or to buy (in the case of a put) the security (or, in effect, the securities represented by an index) at the strike price if requested to do so by the seller's counterparty at any point during the term of the contract.

36.     At the expiration of an option contract, it is said to be either "in the money" or "out of the money," which refers to the relationship between the pre-established strike price of the option contract and the actual price of the security (or index) on a particular date.  The terms "in the money" and "out of the money" have different meanings depending on whether the option is a call or a put.  A call option is "in the money" whenever the strike price is less than the current market price for the underlying security (or index), whereas a put option is "in the money" if the strike price is greater than the current market price for the security (or index).  Conversely, a call option is "out of the money" whenever the strike price is greater than the current market price for the underlying security (or index), whereas a put option is "out of the money" whenever the strike price is less than the current market price for the underlying security (or index).

37.     In practical terms, whether an option is "in the money" or "out of the money" determines what will happen to the contract at its expiration.  If, for example, a call option expires "in the money" (*i.e.*, its strike price is less than the actual market price for the security or index at

the expiry date), it would be profitable for the purchaser of the call to exercise his or her option to purchase the security at the strike price, rather than at the current (and higher) market price. If the same call option expires "out of the money," however (*i.e.*, its strike price is greater than the market price at expiry), it would make little financial sense for the purchaser of the call to exercise its option to purchase at the strike price because the purchaser could instead simply buy the underlying instrument (or index) at the then-current (and lower) market price on the open market. In such a case, the option contract will expire worthless.

38.     Like the market for S&P 500 futures described above, the market for S&P 500 options contracts is one of the most liquid and most traded markets in the world. And as with futures contracts, the value of any given option on the futures (or portfolio of such options) can be readily calculated using widely available pricing algorithms based on: (i) the ***current*** market value of the underlying index; (ii) the amount of time remaining before the option's expiration date; and (iii) prevailing market volatility levels. The value of any given option (or portfolio of options) as of any particular date in the future can also be readily and accurately calculated based on whatever combination of index values and volatility values that a fund manager chooses to model.[4]

39.     As noted above, application of AllianzGI's investment strategy with respect to the "alpha component" of the Fund's portfolio involved causing the Fund to enter into S&P 500-based put and call option contracts. To a significant extent, this component of AllianzGI's strategy involved selling (a/k/a "writing") so-called "short options" that AllianzGI expected would expire "out of the money" and that would, therefore, not be exercised by the entities that purchased those options from the Fund. For illustrative purposes, if the S&P 500 Index were trading at 2500, as part of its strategy, the Fund might write S&P 500 call options with a strike price of, say, 2750 –

---

[4]     Certain other factors (such as the S&P dividend rate and the prevailing risk-free rate of return) can also impact the value of S&P options at the margins, but their impact is not material to the allegations set forth herein.

which would represent a bet by the Fund that the S&P 500 would close under 2750 at the option's maturity date.  In that expected scenario, the Fund would (i) pocket the value of the premium (*i.e.*, the upfront payment) it received from the buyer who had purchased the contract from the Fund; and (ii) have no liability to the buyer resulting from market changes, as in this scenario the call option would expire "out of the money."  The same scenario would operate in reverse for sales of puts with a strike price of 2250 – in other words, in the expected scenario in which the Index did not decline to 2250, the Fund would again (i) pocket the upfront premium; and (ii) have no liability to the buyer, as the put option would also expire "out of the money" in this scenario.

40.     In the above scenario, the use of short options can be said to create a "profit zone," whereby the strategy yields a positive "alpha" return as long as the closing value of the S&P 500 is between 2250 and 2750 at the option's maturity date.  AllianzGI referred to this aspect of its "alpha" investment strategy as its "Range-Bound Spreads" strategy.

41.     As the above example illustrates, it is a fairly simple process to design a "short options-only" (or "Range-Bound Spreads") portion of an investment portfolio that (for each option sold) will generate a fixed premium upfront and that is guaranteed to yield a net positive return (derived solely from the premiums received upfront), ***provided*** that the market price of the underlying instrument is confined to within (or nearly within) the high and low levels represented by the strike prices on the short calls and short puts, respectively, in the portfolio (*e.g.*, in our example, as long as the S&P 500 Index traded within a "profit zone" of no lower than roughly 2250 and no higher than roughly 2750).[5]

---

[5]     A "short option" position that is only marginally "in the money" (from the perspective of the buyer) may still be marginally profitable to the seller because the loss resulting to the seller from the option being "in the money" may be less than the upfront premium that it received when it sold the option to the buyer.

42.     Indeed, the current value of any given options contract (with its predetermined expiration date) can be readily and accurately calculated using widely available (and fundamentally common) pricing algorithms based on three basic factors: (i) the **current** market value of the underlying index (the S&P 500); (ii) the amount of time remaining before the expiration date of the option (since a contract set to expire tomorrow is far less likely to change in value before the expiry date than a contract that still has 10 weeks to run before expiration); and (iii) the prevailing volatility level in the market (as measured by, for example, a volatility index, such as the "VIX").[6]  Similarly, one can calculate what the value of the contract will be at any given point in the future under basically any conceivable market and volatility assumption by simply plugging in whatever assumed values for such variables that is plugged into any of the widely used options pricing algorithms (such as those available through Bloomberg terminals). And similarly, a fund manager can readily generate graphs showing, with exceptionally high accuracy and reliability, how any given options contract – and how any given **portfolio** of options contracts – will perform over time if one assumes rising or falling values of the S&P 500 Index, or rising or falling levels of market volatility.

43.     AllianzGI described the net premiums that the Fund derived from transacting in options as providing the Fund's "alpha" returns.  Significantly, however, the amount of premium that can be collected on the selling of options is inversely related to the size of the difference between the strike price and the current market price at the time the option is sold.  This is because an investor will be willing to pay much more for "nearer-to-the-money" options that, *e.g.*, will be

---

[6]     When markets are experiencing relatively high levels of volatility, the probability of the current value of a given options contract becoming materially higher (or lower) before the contract's expiration date is higher than would be the case if markets were experiencing relatively low levels of volatility.

"in the money" if the market moves only 50 points in its favor, as compared to an option that will only be "in the money" if the market moves, say, 250 points in its favor.

44.     As was the case with the "beta" component of AllianzGI's strategy for the Fund, these options transactions could be (and were) funded "on margin," which would further increase the Fund's operational leverage.  Indeed, operating on leverage was, as a practical matter, an essential (if inadequately described) component of the Fund's short options-based (a/k/a Range-Bound Spreads) "alpha" strategy because the only way AllianzGI could hope to have the Fund regularly meet its targeted annual return (of 5% greater than the S&P 500 Index, net of fees) would be to: (i) harness the relatively small premiums it received from selling options that it expected to expire "out of the money"; and (ii) *multiply* those expected returns many times over through the power of leverage.

45.     In addition to selling a combination of "short calls" and "short puts" to create a basic profit zone, as described above, the Fund's investment strategy also involved employing combinations of short options and "long options" – as part of what AllianzGI called a "Directional Spreads" strategy – that would generate favorable returns even if the performance of the S&P 500 were sufficiently volatile that it fell outside the core profit zone established pursuant to the "Range-Bound Spread" (or "short options-only") component of its "alpha" portfolio.  Creating such "extended" profit zones can be viewed as creating a hedge against underperformance of the "short options" that defined the profitability limits of the "profit zone" created by the "Range-Bound Spread" portion of the Fund's portfolio.  For example, by pairing (i) the *sale* of additional calls (resulting in "short call" positions) that have, *e.g.*, a strike price of 3000 (which is not expected to be reached) with (ii) the *purchase* of calls (resulting in "long call" positions) that have, *e.g.*, a strike price of 2750, the Fund could create an additional "profit zone" (or what might be called an

"upside extended profit zone") where the combination of these positions would be profitable as long as the market traded between roughly 2750 and 3000.  Conversely, by utilizing combinations of short puts and "long puts" with strike prices of 2000 and 2250, respectively, one can lock in profits as long as the market traded between roughly 2000 and 2250 (in what might be called a "downside extended profit zone").[7]

46.     To put it another way, AllianzGI described the benefits of the "Directional Spread" component of its strategy as allowing the Fund to "benefit from a large index move to the upside and/or downside," with the resulting options positions "act[ing] as portfolio diversifiers, with the ability to add incremental gains when markets behave less typically."  AllianzGI also represented that, historically, the core "Range-Bound Spread" component of the Fund's portfolio contributed roughly two-thirds of the Fund's "alpha" and that the "Directional Spread" component had contributed the remaining one-third.

**C.     The Fund's "Long Put" Hedges Against More Extreme Market Declines – and the Need for Active Management to Protect Fund Investors' Capital In Scenarios Where the Market Begins to Materially Move Against the Fund's Overall Portfolio Position**

47.     Finally, to protect against the most extreme declines in the value of the S&P 500 and related adverse market volatility, the Fund represented that it purchased hedges in the form of long puts.  AllianzGI materials referred to this third leg of its "alpha" strategy as consisting of its "Hedging Positions," which were "designed to protect the portfolio in the event of a market crash."  Such long puts would have strike prices that would only be "in the money" (from the perspective of the Fund as the buyer of the put) if the market fell below the bottom limit of its "downside extended profit zone."  For example, to continue with our example above, the Fund – while the

---

[7]     The concept of core and extended "upside" and "downside" profit zones was reflected in Allianz's own materials.  *See, e.g.*, materials reproduced at ¶¶60, 72, and 74 below.

market was still at 2500 – might prudently purchase long puts with strike prices below 2000 to provide a hedge that would protect against a 20% or greater market decline – *i.e.*, it would buy puts that would become more valuable (and eventually be "in the money") if and as the market index fell closer to (or below) 2000.

48.     Due to the exceptional transparency and efficiency of the markets for S&P 500 futures and options contracts – and the reliability of the common and nearly identical algorithms that are used by market participants (such as the common Black-Scholes pricing models and related algorithms that are programmed into every standard options calculator, and which are readily available and used as a matter of course by every professional trader and broker in the world) to value any given options or future contract under virtually any conceivable combination of assumed index and volatility values as of any selected date – it is effectively just a matter of non-negligent application of basic futures and options concepts to construct a leveraged S&P 500 Index-based futures and options portfolio that is effectively guaranteed to provide positive returns, as long as the S&P 500 trades within certain predefined ranges.  Indeed, as further discussed below, given the power of computers, one can also readily determine with an extremely high degree of accuracy what the investment performance of such a portfolio will be at any given point in time in the future based on two primary inputs, namely: (i) the assumed value of the S&P 500 Index on such future date; and (ii) the assumed level of prevailing market volatility on such date (which is most commonly measured using what is known as the "VIX Index").  Because this type of hedging involves ***buying*** (rather than selling) puts that are expected to expire well "out of the money" (*i.e.*, be worthless at expiry), a buyer (such as the Fund) expects to lose all the money it has to pay out as premiums to buy such positions.  Purchases of such hedges would therefore necessarily reduce

the Fund's overall investment performance in all but the most extreme market downturns, but can be viewed as a form of insurance against sharp market declines.

49.     Unfortunately for investors generally, just as there are no "free lunches" in life, there is no investment strategy (whether options-based or otherwise) that can guarantee risk-free profitability in *every* conceivable scenario.  Thus, the price of striving for returns that are consistently (and materially) greater than the return of a benchmark, such as the S&P 500, is that the risk of incurring large losses will increase sharply as the market moves increasingly towards (and past) the extremities of the overall "profit zones" that the portfolio was originally built around. In such scenarios, a fund manager implementing the type of relatively "plain vanilla" futures and options strategies on which the Fund relied, and that (as here) had also represented to its investors that it could achieve consistently high returns while simultaneously protecting investors' capital from large losses, invariably has two fundamentally different choices.

50.     First, as the market moves increasingly away from the "center point" around which the portfolio is balanced and into increasingly more risky extremes of lower values and greater volatility, the fund manager can reduce the fund's risk (including the risk of catastrophic loss) by (i) reducing the fund's leverage; (ii) buying additional hedges (such as long puts); and (iii) otherwise effectively "rebalancing" the portfolio so that its center point adjusts in response to the falling market.[8]  However, the cost of reducing risk will, at a certain point, come at the cost of having to accept materially lower investment returns, whether as a result of reducing leverage or by having to pay costs associated with rebalancing the portfolio.  Significantly, a fund manager's

---

[8]     For illustrative purposes, one might consider the following example to illustrate the concept of rebalancing. Assume a portfolio that originally structured to create core ("Range-Bound") and extended ("Directional Spread") profit zones that were centered (or "balanced") around an S&P 500 Index value of 2500.  If the market thereafter trades down over a given period to only 2200, a prudent fund manager will reposition the portfolio's option positions and resulting "profit zones" accordingly over the same period to re-balance them around a new "center point" of 2200.

delay in implementing risk mitigation steps can also result in a fund having to pay much higher prices for, *e.g.*, its failsafe hedging positions (consisting of long puts with low strike prices) than would have been the case had the manager acted earlier.  For example, a long S&P put that could be purchased for a given amount based on current market conditions with a strike price 12% below the current value of the S&P 500 can be expected to at least ***quadruple*** in price (*i.e.*, to increase by roughly a factor of four or more) if, during the following hours, days, or weeks, the S&P 500 were to decline by roughly 5% and the VIX (volatility) were to increase by roughly 15 points.[9] This type of scenario is one that would be part of any reasonably competent and prudent fund manager's daily risk-management framework and stress testing.

51.     Second, as the market moves increasingly away from this type of fund's center point and becomes more volatile, instead of acting to reduce the fund's growing risk, a manager may instead choose to effectively "stay the course" (by doing nothing or by engaging in only nominal or otherwise wholly inadequate hedging or re-balancing efforts) in the ***hope*** that the market will reverse course and return the fund to the middle of its original "profit zones" (where the fund will both outperform its benchmark index and also return to a low risk state).  But a fund manager that relies on such hopes (rather than actively reducing portfolio risk) runs an increasingly foreseeable and reckless risk of financial catastrophe for his or her investors.

### D.     The Moral Hazard Incentives Built into the Fund's Fee Structure

52.     As described in the Offering Documents, the fees payable by Fund investors (a/k/a "Members") to AllianzGI for managing the Fund provided for an "incentive allocation" to be paid

---

[9]     For example, a short put option on a S&P 500 futures contract expiring on September 18, 2020, with a strike price set at 2850 (equal to 12% less than the-then current S&P 500 level), would have cost roughly $1,225 if purchased on July 29, 2020.  However, if one were to assume that the next day the S&P 500 experienced a one-day decline of just 5%, and that VIX volatility increased by 15 points, the same option (2850 strike price and expiring on September 18, 2020) would cost $5,415 – ***or 442% more***.

to AllianzGI each quarter from the Fund's assets.  Specifically, as described in the PPM, AllianzGI was entitled to receive, at the end of each calendar quarter, "30% of the excess of the Net Capital Appreciation . . . allocated to the Capital Account of [each] Member for such calendar quarter over the amount which such Member's Capital Account would have earned had it generated a return equal to the [S&P 500] for such calendar quarter."   In other words, each Fund investor was in essence required to pay to AllianzGI 30% of the amount by which the returns on the "alpha" portion of the Fund's portfolio generated returns in excess of the returns on the "beta" portion of the portfolio (given that the Fund's "beta" portfolio was structured to track the returns of the S&P 500 Index).

53.   Significantly, the Fund's management fee structure also included what AllianzGI referred to as a "cumulative high water mark" feature.  Whereas the 30% of "excess returns" feature would result in AllianzGI being rewarding for successful investment performance, the "high water mark" feature was effectively structured to impose an offsetting penalty for poor performance.  Specifically, the "high water mark" feature was structured so that "the Net Capital Appreciation upon which the calculation of the Incentive Allocation [on an investor's account] is based" would be *reduced* in proportion to the aggregate amount (if any) by which the returns on the investor's account had previously underperformed the performance of the S&P 500.  In other words, if the account of a given investor were to underperform compared to the S&P 500, that investor would not owe *any* fees to AllianzGI unless and until the market value of that investor's account balance returned to (and increased above) its previous "high water mark."

54.   Notably, the "incentive allocation" fee was the *only* fee that AllianzGI collected from the Fund's investors.  Unlike the standard "two and twenty" fee structure employed by typical hedge funds, in which the fund manager collects both a management fee, calculated as a percentage

of the fund's total assets under management, and a separate performance fee that is a percentage of the fund's profits, AllianzGI did *not* collect a management fee.  This meant that if the Fund's assets were to dip significantly below the Fund's "high water mark," AllianzGI faced the prospect of months or years without collecting *any* fee for its management services.  Part of what allowed AllianzGI to implement this type of fee structure was the fact that AllianzGI was part of Allianz Global Investors – the Allianz Group's global asset management business – which gave AllianzGI the benefit of economies of scale, as well as centralized risk-management and oversight functions.

55.     Although this "high water mark" feature was structured in a way that arguably incentivized AllianzGI to generally avoid scenarios where investors' accounts were exposed to meaningful risks of loss, the feature also could create increasingly serious and dangerous "moral hazard" problems in situations where AllianzGI failed to adequately manage the Fund's risk (either though inaction or undue delay).  More specifically, to the extent that AllianzGI failed to prudently and timely "rebalance" the Fund (and/or to otherwise reduce risk by reducing leverage and buying more long puts) in response to index price movements towards the lower extremities of the Fund's existing "profit zones" – and in response to any related increases in directionally negative market volatility – the costs of belatedly reducing portfolio risk could increase sharply, as long as market trends continued to move against what would, in effect, be an increasingly "unbalanced" portfolio. And at a certain point, the costs of belated hedging might become so great that a fund manager might well rationally conclude that it was in the *manager's* best financial interests to instead simply hope for the markets to "revert to the mean" rather than to lock in substantial losses (due to the high costs of belatedly implementing risk reduction measures).  Although even belated implementations of risk reduction measures would likely continue to be in the best interests of the Fund's *investors*, any portfolio losses would still be overwhelmingly born by the Fund's investors

and not the Fund's **managers**.  And rather than lock-in, say, a 20% portfolio loss in connection with belated efforts to reduce risk – which might put the Fund's manager "in a hole" that would take them years to get out of under the Fund's "high water mark" provisions – a self-interested Fund manager might well be motivated to simply hope for a favorable change in the market even if it risked **catastrophic** losses for the Fund's investors (because the fund manager, in the event of a portfolio meltdown, would not lose its own money and could seek to simply shut down the fund and start afresh with a new fund that would not come with the overhang of substantially "sub-high water mark" market value).

## II.    **AllianzGI's False and Misleading Statements Concerning the Fund's Risk Controls**

56.    In 2018, AllianzGI prepared a slide presentation (the "2018 Investor Presentation") for the Fund's investors, including Plaintiff, in which AllianzGI made substantially identical false and misleading representations to its investors regarding the Fund's risk characteristics and risk controls.

57.    Among other things, AllianzGI claimed in the 2018 Investor Presentation that the Fund was "designed to outperform whether equity markets are up or down, smooth or volatile," citing its "three-pronged investment objective" of: (i) "outperform[ing] during normal (up/down/flat) market conditions"; (ii) "**protect[ing]   against   a   market   crash**"; and (iii) "navigat[ing] as wide a range of equity-market scenarios as possible."

58.    With respect to avoiding risk – including the risks associated with making "bets" on the "direction" of either the market or volatility – the 2018 Investor Presentation further represented that the Fund's managers would:

- "pursue outperformance, but [] not presume that the market will behave normally or that history will repeat itself";

- "**never make a forecast on the direction of equities or volatility**";

- "always be a net buyer of put options, ***providing protection against a tail event or market crash***"; and

- "prepare for the unexpected" and "pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses."

59.     AllianzGI further represented that it would achieve these goals by relying on the investments strategies discussed earlier and which AllianzGI described as being based on the following:

(a)     "Range-bound" spreads, which involved collecting upfront premiums on sales of "short call" options that were expected to expire worthless, as long as the S&P 500 traded within a particular range (thereby allowing the Fund to retain all of the upfront premiums, without any offsetting losses that would be incurred if the S&P 500 Index traded ***outside*** that range);

(b)     "Directional spreads," which involved investing in a combination of short and long put and call options and which would also be profitable on a net basis, as long as the S&P 500 traded within certain ranges that effectively created additional, extended "profit zones"; and

(c)     "Hedging Positions," which involved buying long put options that operated primarily as insurance.  As previously discussed, these long put options were expected to expire "out of the money," which would mean that the premiums paid to buy them would not be recouped – but if they expired "in the money," the resulting profits could be used to offset the losses that would be incurred by the "range-bound" and "directional spread" components of the portfolio in the event that the market suffered (in AllianzGI's words) a "short-term equity-market crash."

With respect to its relative positioning in "long puts" vs. "short puts," AllianzGI also specifically represented in its 2018 Investor Presentation that the Fund would hold "approximately 30% to

50% more long puts than short at all times" – in other words, that the Fund would always be "net long options," giving investors comfort that the Fund would be protected from (and might even profit from) a significant market move to the downside.   AllianzGI also represented that it maintained a "laddered" portfolio of long puts as part of its "Hedging Positions" strategy with strike prices ranging from -10% to -25% at acquisition (*i.e.*, long puts that would be "in the money" if the S&P 500 *fell* 10% to 25% compared to the S&P 500's level when they acquired such puts) and that, as market volatility rose, the Fund would increase the amount it would spend on hedging strategies (*i.e.*, on increasing the relative size of its "long put" positions).

60.     AllianzGI illustrated these three methods using the following diagrams:



61.     Taken together, these three diagrams effectively represented that the Fund's portfolios could, and would always, be managed to operate in a "profit zone" (or at least outperform the S&P 500) regardless of whether the S&P 500 went up, down, or stayed the same

(except in circumstances where the S&P 500 increased in value dramatically, in which case the Fund's investors would presumably not be unduly concerned because (i) the Fund's "beta" component would be generating a strong absolute return; and (ii) the Fund's investors would presumably be reaping large returns from the bulk of their non-Fund investments).

62.     AllianzGI also represented in the 2018 Investor Presentation that it subjected the Fund's portfolio to a three-pronged "risk management" regimen that included "scenario analysis," "portfolio monitoring," and "stress testing."   In a due-diligence questionnaire distributed to potential investors in the Fund during September 2017 (the "2017 Due Diligence Materials"), AllianzGI further represented that the Fund's risk controls included the conducting of "31 stress tests," as well as the performance of "an extensive set of scenario analyses to ensure that all portfolios' style and construction are within guidelines."

63.     AllianzGI further represented in the 2017 Due Diligence Materials that AllianzGI's "Performance and Portfolio Risk function monitors daily trade activity and weekly risk profiles to check for any significant shifts" in the Fund's portfolio.  To do this, AllianzGI represented that it was supported by an "independent service provider," IDS GmbH-Analysis and Reporting Services, which was a wholly owned subsidiary of Allianz SE that AllianzGI represented would provide the Fund with a "comprehensive range of on-going and consistent performance and risk analysis reports."

64.     In addition, in its Client Commentary for the third quarter of 2018 that was provided to each Fund investor, AllianzGI further represented that it would "always prioritize preserving [the Fund's] risk profile," *even at the risk of limiting the Fund's profitability*, stating:

> When volatility is low, [the Fund's] expected outperformance would typically be limited to its targeted rate, but not greater. ***This is because we <u>always</u> prioritize preserving our risk profile***. Even if outperformance is behind schedule for the year, as is the case in 2018, we still will not reach for a faster recovery by tightening our

range-bound profit zones to collect more option premium. ***To take on greater risk in a low-volatility environment would be short-sighted and imprudent***.

65.     As set forth below, however, AllianzGI's representations concerning its purported approach were materially false and misleading.  In particular, to the extent that AllianzGI actually performed conducting stress tests (let alone 31 different stress tests) and other "scenario analyses to ensure that all portfolios' style and construction [were] within guidelines," AllianzGI failed to disclose that it deliberately, or recklessly (or at least negligently), ignored and/or failed to prudently respond to warning flags that even the most basic and elementary of risk-management testing identified, and/or that it lacked reasonably adequate risk-management controls to avoid a meltdown in the value of the Fund's portfolio.  In addition, as further described below – and contrary to its assurances that it would "always prioritize preserving our risk profile" – since at least 2017, AllianzGI had increased (and would continue to substantially increase) the Fund's leverage to "chase" higher alpha returns at the expense of proper risk controls.  AllianzGI's increasingly reckless pursuit of higher alpha returns had the entirely predictable effect of increasing (and was motivated primarily by AllianzGI's desire to increase) the amount of "incentive allocation" fees that AllianzGI could collect from the Fund's investors – but also had the equally predictable effect of increasing the Fund's exposure to sharp markets declines (other than declines that quickly reversed course).

66.     Unfortunately for investors, however, AllianzGI's reckless pursuit of higher alpha returns also had the equally predictable and foreseeable effect of exposing the Fund's investors to catastrophic losses in the event that markets did not cooperate, as further discussed below.

67.     In contrast to the Offering Documents' statements concerning the Fund's use of "operational leverage," AllianzGI also misleadingly represented in the 2018 Investor Presentation that the Fund would engage in "no borrowing" – while conspicuously failing to explain or disclose

how AllianzGI's options-trading strategy **relied** on purchasing futures and options contracts on margin, which greatly increased the Fund's leverage and risk exposure.

### III.   AllianzGI Begins to Increase Risk by Increasing the Fund's Leverage and "Tightening the Spreads"

68.    As previously discussed, one of the two critical variable inputs in determining the value of an option at any given point in time is **volatility**, or the level of fluctuation in the market price of the underlying asset.[10]   As an asset's volatility drops, so does the price at which an "out of the money" option based on that asset can be sold.[11]   The current price of an S&P 500-based option contract will reflect the then-current level of volatility (which is widely measured using the VIX Index), and the same option's price as of any future date can be reliably calculated based on whatever different volatility (and S&P 500 Index) values are input for that date.

69.    Throughout 2017 and the first three quarters of 2018 (with the notable exception described immediately below), the level of volatility in the stock market, as measured by the VIX, was at historically low levels.

70.    As this low-volatility environment continued throughout 2017 and 2018, the prices that the Fund received for its sales of options dropped, thus reducing the incremental "alpha return" that each sale could generate.

71.    In order to meet (if not exceed) the Fund's investment goal of consistently outperforming the S&P 500 by 5% each year, net of fees – and to maximize AllianzGI's lucrative 30%-of-the-profits "incentive allocation" fees based on **AllianzGI's** assessment of risks vs.

---

[10]    The other key variable input in pricing a given S&P 500 Index option is the price of the underlying index. The other two most important pricing inputs are the strike price and the unexpired length of the option term, but those inputs are fixed (rather than variable) in any given option transaction.

[11]    Conceptually, this is primarily because it becomes less likely that an "out of the money" option will expire "in the money" as markets become increasingly tranquil.  Conversely, increasing volatility makes such an option more valuable, as increased volatility makes it **more** likely that such an option will expire "in the money."

rewards as they impacted *AllianzGI's* financial interests (rather than the interests of the Fund's investors) – AllianzGI needed to find an additional source of alpha returns.

72.     As Plaintiff's consulting experts have concluded, during 2017 and 2018, AllianzGI caused the Fund to achieve these additional alpha returns by causing the Fund to engage in either or both of the following practices:

(a)     Selling the same option contacts (*i.e.*, options with the same terms and strike prices that the Fund would otherwise have bought at any given point in time), but causing the Fund to sell a materially increased *volume* of such options.  This practice would not have increased the incremental return on any given contract (the so-called "alpha return"), but the increased volume would have enabled the Fund to collect more "alpha" in the aggregate.  However, AllianzGI could only increase its writing (*i.e.*, selling) of such option contracts by selling them on margin, which, in turn, would materially increase the Fund's leverage and resulting risk exposure.

(b)     "Tightening" the Fund's profit zones by *reducing* the "spread" between the strategy's put and call options.  To illustrate this concept, the diagram below from AllianzGI's 2018 Investor Presentation represents an illustrative spread between the two aspects of the "short options-only" component of the Fund's investment strategy, where (i) the short-call options are priced at 7% above the S&P 500 Index at inception; and (ii) the short-put options are priced at 12% below the S&P 500 Index at inception – resulting in a spread of 19%:



The resulting 19-point spread defines the boundaries of the Fund's "profit zone" for the "short-options-only" component of the Fund's strategy in this example because the strategy in this example will invariably make money for the Fund ***provided*** that the S&P 500 continues to trade "within the spread" (*i.e.*, in this example, between 2300 and 1890, corresponding to underlying changes in the S&P 500 Index ranging from +7% to -12%). "Tightening the spread," using this example, would involve reducing the top end of this range below 7% and/or increasing the lower end of this range above -12%.

73.    By "tightening the spread," the Fund could increase its incremental profits-per-option ***provided that*** market volatility remained relatively low.  For example, by "tightening" the spread by two percentage points on both ends, the Fund has the potential to achieve materially greater alpha from each of its options sales.  This is because, for example, a call option that is written based on a strike price that is only 5% "out of the money" can be sold for a higher premium than a call option that is sold based on a strike price that is 7% "out of the money" (because buyers are willing to pay materially more for a call option that requires less volatility before it becomes "in the money").

74.     The same type of "tightening the spread" approach could be, and almost certainly was, applied to the "Directional Spread" portion of the Fund's alpha portfolio beginning at some point in 2017.  As reflected in ¶60 above, the "Directional Spread" portions of the Fund's portfolio might be graphically illustrated as follows:



To build on the illustration given in the immediately preceding paragraphs above, just as one can tighten the "core" profit zone of the core "Range-Bound Spread" portion of a portfolio (by two percentage points at both ends, to +5% and -10% in our example), one can correspondingly tighten the next set of "spreads" that define the additional upside and downside "profit zones" created by the options comprising the Fund's "Directional Spread" portion of its portfolio.  For example, it would simply be a relatively simple matter for an options trader to create upside and downside "profit zones" that, unlike the (+6% to +9%) and (-6% to -16%) spreads shown in the above chart, would be defined by "tighter spreads" – and tighter corresponding upside and downside "profit zones" – of, for example, (+4% to +7%) and (-4% to -14%), respectively.

75.     But once again, there is "no free lunch" because materially tightening the spreads necessarily results in materially increasing this type of portfolio's risk profile.  In sum, tightening spreads means tightening the "profit zones," and tightening the "profit zones" means ***increasing*** the "loss zones."  Of equal or greater concern is the fact that doing so will also reduce the distance between (i) the portfolio's "center of gravity" (measured by reference to the level of the S&P 500 Index); and (ii) and the points in the "loss zone" where the portfolio would begin to suffer catastrophic losses.  In other words, given the leveraged nature of the Fund, each tightening of the spreads described above also raised the risk that a sharp and sustained decline in the S&P 500 Index would cause drastic losses that would dwarf the value of the offsetting gains (if any) on the Fund's "failsafe," long put Hedging Positions.

## IV.    How AllianzGI's Dodging of a Bullet in 2018 Led It to Make Further (and Egregiously) False and Misleading Claims About the Fund's Investment and Risk Management Practices

76.     In late January and early February 2018, the low-volatility environment that had characterized 2017 and the first few weeks of 2018 was violently disrupted in a market event that would later come to be known as "Volmageddon."

77.     On Monday, February 5, 2018, the S&P 500 fell 4.1%, to 2648.94, from its closing level of 2762.13 on the prior Friday, February 2.  This decline also reflected a cumulative two-day decline of 6.1% since Thursday, February 1 (when the S&P 500 closed at 2821.98), and a one-week decline of 7.8% since the end of trading on Friday, January 26 (when the S&P 500 closed at 2872.87).

78.     In addition, on February 5, 2018, the VIX jumped, rising from 17.31 to 37.32 – a 115.6% increase compared to the prior trading day.  The increase in the VIX on February 5 constituted the largest one-day percentage move since the current VIX calculation method was created in 2003.

79.    Over the next three trading days, the S&P 500 fell another 2.6% (to 2581.00 on February 8), representing a total four-trading-day decline (from the close on February 1 through the close on February 8) of 8.5%, and a nine-trading-day decline (from the close on January 26) of 10.2%.  However, the S&P 500 recovered roughly half of its losses from this nine-day period by February 15, 2018, when it closed at 2731.20.  The sharp increase in the VIX also reversed course after February 8, as it fell back over the next week of trading to roughly 19 at the close on February 15, 2018 (and representing roughly a 50% decline from its peak of 37.32).[12]

80.    These market events are illustrated in the chart below (the red line is the VIX and the white line is the S&P 500):



81.    Unlike a number of other funds that invested heavily in options, the Fund escaped the so-called February 2018 "Volmageddon" event without suffering significant losses.  As AllianzGI represented to the Fund's investors in its Client Commentary for the first quarter of 2018 – which was the first Client Commentary it circulated following the events of February

---

[12]    Allianz itself described VIX index levels between 18 and 25 as reflecting "mid-volatility" levels; it described VIX levels below 18 as reflecting "low volatility" and VIX levels greater than 25 as reflecting "high volatility."

2018 – the Fund had "underperformed . . . as equity markets underwent an abrupt shift from a smooth to a sharply whipsawing environment," which had made for a "challenging quarter for the strategy's options positions." Nevertheless, AllianzGI further stated that it was "pleased" that the Fund's portfolio "was able to limit the damage from this most recent market storm" – and affirmatively represented that "the first quarter [of 2018] was a clear demonstration of [the Fund's] ***rigorous risk management***, its essential combination of short and long volatility, ***and the resilience of [our] option strategy overall***." As further discussed below, however, such representations were materially false and misleading, as the reality was that, far from having "rigorous risk management," the Fund had actually dodged a bullet – and had done so only because the VIX and the S&P 500 had recovered to a significant extent so quickly (within roughly 10 days).

82.     In its Second Quarter 2018 Client Commentary, after the Fund had recouped its losses from the first quarter, AllianzGI further boasted that it was "pleased to have protected the option portfolio well during the turbulence" experienced in late January and early February 2018.

83.     During the last three quarters of 2018 and all of 2019, the VIX returned to its previous and relatively low levels. Indeed, the VIX averaged only 15.83 over this period, with the fourth quarter of 2018 (when the VIX rose to as high as 36.07 before returning to its prior low levels) being the only exception to an overall period of low volatility. In addition, with the exception of a short-lived downturn in the fourth quarter of 2018 (which was erased by the end of the following quarter), the S&P 500 traded steadily up during the same period, rising from 2641 at the end of the first quarter of 2018 to close at 3235 on December 30, 2019.

84.     As previously noted, however, during this same period, AllianzGI caused the Fund to continue to engage in high risk "tightening the spreads" and "increasing leverage" practices.

85.     Nonetheless, AllianzGI continued to falsely assure investors that it would always place primary importance on its "rigorous risk management" and ensure that the fund maintained – and would continue to maintain – a purportedly prudent "risk profile."  For example, as AllianzGI expressly represented to its investors in its Third Quarter 2018 Client Commentary for the third quarter of 2018, "*we always prioritize preserving our risk profile*" and that, even when volatility is low, "*we still will not . . . [engage in] tightening our range-bound profit zones to collect more option premium [because] [t]o take on greater risk in a low-volatility environment would be short-sighted and imprudent*."  This statement was either an outright lie or sufficiently reckless so as to constitute a flagrant disregard for the truth.

86.     In early 2020, in its Fourth Quarter 2019 Client Commentary – and in order to maintain its existing customer base and attract additional large investments (and resulting increased fee income) from both old and potentially new investors – AllianzGI made even more extravagantly false and misleading misrepresentations.  For example, AllianzGI represented that its investment strategies were so well managed and protected against sharp market disruptions that the Fund was actually positioned to *make* money and *reap higher profits* (rather than merely experience limited losses) in the event of "another February 2018-type move," and further represented that the Fund was "as prepared as ever in the event of a *severe* market dislocation." As AllianzGI told its investors:

> We do believe Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move.
>
> Macro environment aside, *today we are as prepared as ever in the event of a severe market dislocation. The obvious comparison is two years ago [i.e., February 2018]:* Coming off a 22% gain in 2017, the S&P 500 defied expectations in January 2018 with an additional 6% rise that drove the VIX down to 10, but then in early February underwent a violent correction and volatility surge. While certainly we have no idea what lies ahead in the markets, *we do believe Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move*. Beyond the fact that we are building option positions at

higher volatility levels than two years ago, *the refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio **more** resilient*. As a result, whether or not the current market conditions continue, we look forward in 2020 to pursuing risk-managed outperformance on our investors' behalf.

87.    As shown below, however, AllianzGI's representations that (among others) "we are as prepared as ever in the event of a severe market dislocation," that it believed that the Fund's option portfolio "*is positioned for a strong improvement in the event of another February 2018-type move*," and that "the refinements we have implemented since [February 2018] . . . have made the option portfolio more resilient" were either outright lies or sufficiently reckless so as to constitute a flagrant disregard for the truth.

## V.    The Fund Crashes – and Suffers Catastrophic Losses that Should Have Been Avoided – Following Market Disruptions in the First Quarter of 2020 of the Type that Had Occurred in February 2018 and that AllianzGI Had Falsely Claimed the Funds Were Prepared For

88.    Having boasted of its preparedness to withstand (and in fact profit from) a repeat of a "February 2018-type" scenario – namely a dramatic rise in the VIX and accompanying significant decline in the S&P 500 – beginning in late February 2020 AllianzGI and other investors were presented with that very type of scenario.

89.    More specifically, during the last week of February 2020, the VIX jumped from 17.08 at the close on Friday, February 21, 2020, to 40.11 on February 28 – representing an exceptionally large one-week increase of 134%.  During this same one-week period, the S&P 500 fell from 3337.75 to 2954.22, representing a sharp decline of 11.5%.  The S&P 500 then briefly rallied in early March 2020 – recouping nearly half of its losses and closing at 3130.12 on March 4.  But over the next eight trading days, from March 5 through March 16, the S&P 500 again traded down (closing at 2386.13 on March 16), equal to a further decline of 19.2% for the month and an

overall decline of 28.5% since February 21.  Over the same period, the VIX's measure of volatility

also rose, hitting 82.69 on March 16.

90.      The aforementioned market changes are illustrated in the chart below:



91.      Contrary to AllianzGI's representation and assurances, however, the Fund was not

positioned to withstand (let alone profit from) such market movements.

92.      Instead, consistent with its practice of actually running the Fund in a manner that

sacrificed prudent risk-management practices in the pursuit of maximizing its own "risk-reward"

payoffs under its fee arrangements, AllianzGI flagrantly disregarded its investors' interests in

preserving capital.  As a result, instead of the "strong improvement" in the Fund's performance

that AllianzGI had promised in the event of "another February 2018-type move," by the end of

March 2020, the value of the Fund's portfolio **collapsed**, **losing _over 75%_** of its investors' money,

or roughly $950 million in total.

93.      AllianzGI's abject failure in protecting the Fund against this stunning collapse was

especially egregious here because AllianzGI had ample time over the course of late February and

the first half of March 2020 in which to prudently reduce leverage, regularly re-balance the

portfolio, and build up its "back-stop" long put hedge positions.  As noted above, because of the

depth and transparency of the S&P 500 options market, AllianzGI had the ability, at any given point in time, to not only accurately determine the *current* value of its portfolio, but to accurately calculate what would happen to the value of that portfolio under any combination of changes in the S&P 500 and VIX that it cared to model.  The market changes that transpired over the *several weeks* that it took for the S&P 500 and VIX to reverse course during this February/March 2020 period were therefore not the kind of near-instantaneous events that might leave an options-trading investment manager insufficient time to reduce risk.  Indeed, even more so than was the case in early February 2018 two years earlier (when the relevant spikes occurred within the course of a single week), AllianzGI had plenty of time, as the market continued to move against the Fund and closer to the downside edge of the Fund's overall "profit zone," to reduce the Fund's leverage, rebalance its portfolios, and otherwise reduce risk.

94.     However, as evidenced by the Fund's catastrophic performance, AllianzGI deliberately and recklessly (or at least negligently), and contrary to its prior representations and in violation of its contractual and fiduciary duties to Plaintiff and the Fund's other investors, failed to take meaningful steps to reduce the Fund's risk during late February and March 2020 – and instead effectively chose to place their primary reliance (as they had in February 2018) on a speedy reversal of adverse market trends (declining S&P 500 and increasing volatility) to avoid catastrophe.  Despite its misconduct and imprudence, AllianzGI had managed to "dodge the bullet" in February 2018 when the market reversed course – but its inadequate risk controls and reliance on dumb luck (*i.e.*, an exceptionally rapid and favorable change in the markets) was insufficient to allow it to dodge the same kind of bullet in early 2020.

95.     The Fund's "incentive allocation" fee structure – and in particular, its "cumulative high water mark" feature – again incentivized AllianzGI to avoid taking the kinds of steps that

were necessary to protect the Fund and reduce its risk exposure to reasonable and prudent levels.

By early March 2020, the losses already sustained by the Fund's investors meant that, at typical

growth rates, it would be multiple quarters (or even years) before the Fund's value would bounce

back to its previous "high water mark" and allow AllianzGI to collect management fees again.

Acting to protect Fund investors by reducing leverage or purchasing increasingly expensive hedges

would have only served to "lock in" these losses; instead, AllianzGI chose to gamble (with its

*investors'* money) that a favorable change in the investment winds would put the Fund's

increasingly risky (and, ultimately, increasingly disastrous and money-losing) portfolio back into

the profitable territory, which, in turn, would allow AllianzGI to maximize its ability to continue

to collect lucrative incentive allocation fees going forward.

## VI.   AllianzGI's Subsequent Efforts to Explain the Fund's Collapse Raise More Questions Than They Answer

96.     In early July 2020, AllianzGI circulated a document to its investors entitled

"Structured Alpha March 2020 Performance."  That document (the "July 2020 Memo") purported

to summarize the results of an "analysis" that AllianzGI had conducted to "better understand the

sources of fund losses" that had been suffered in the first quarter of 2020.  According to AllianzGI,

its "analysis" concluded that AllianzGI had managed its Structured Alpha Portfolio "in accordance

with its design" and that the catastrophic losses suffered in March 2020 "were not the result of any

failure in [AllianzGI's] investment strategy or risk management processes."[13]

97.     The July 2020 Memo further represented as follows:

---

[13]     The July 2020 Memo was drafted in terms of analyzing Allianz's overall "Structured Alpha Portfolio," which was, in turn, comprised of not only the Fund, but several other funds that purported to rely on slightly different variations of the same basic investment strategy, including, among others, the "Structured Alpha US Equity 250" fund and the "Structured Alpha US Equity 1000" fund, which respectively sought to achieve 2.5% and 10% "alpha" returns in excess of the S&P 500.  Conceivably, certain portions of the July 2020 Memo contain statements that were meant to refer to only some (but not all) of these funds, but the July 2020 Memo is written in a manner that did not differentiate among those funds, and one can thus infer that the statements about how the "Portfolio" was (allegedly) managed apply to all three of Allianz's "Structured Alpha Funds," including the Fund.

*The Portfolio losses were the direct result of the speed, duration and severity of the market decline and attendant increase in volatility, which overtook the Portfolio Management team's portfolio restructuring process*. This restructuring process, which has been a cornerstone of the Structured Alpha products' alpha strategy since its inception in 2005, operated as described to investors and was implemented during this period as it was in past market downturns.

Since the inception of the Structured Alpha strategy, the Portfolio has held options positions grouped into three core strategies: (i) Range-Bound Spreads; (ii) Directional Spreads; and (iii) Hedging Positions. . . . *[T]he Hedging Positions play an important role in providing protection to the Portfolio against a sudden volatility increase and market shock. In the case of less dramatic market movements, the Portfolio's risk profile is primarily adjusted through the restructuring of the Range Bound Spreads and Directional Spreads*. The Portfolio Management team restructures by closing out of and then re-establishing the options in the Range Bound Spreads and Directional Spreads as the S&P 500 and other indices change.

\* \* \*

*The [Funds'] deep out-of-the-money Hedging Positions . . . are designed to act as a protective back-stop against sudden market shocks with volatility spikes. In the absence of a dramatic and sudden crash or spike, however, the Portfolio is exposed to potential losses when the market moves beyond the profit zones [established by the Funds' Range-Bound Spreads and Directional Spreads]. The Portfolio Management team addresses these exposures through restructuring*.

\* \* \*

As market stress increased, the risk exposure of the Portfolio was reduced by the systematic restructuring of the options positions.

98.    The July 2020 Memo then proceeded to discuss how AllianzGI's approach to risk management allegedly "utilized three lines of defense," consisting of (i) the "Portfolio Management teams"; (ii) "AllianzGI's independent Enterprise Risk Management and Compliance teams"; and (iii) the "Internal Audit function" of Defendant AllianzAM.

99.    With respect to the purported operation of AllianzGI's "first line of defense," the July 2020 Memo stated:

AllianzGI has at all times, including during February and March 2020, had in place risk mitigation approaches to offset a portion of losses or mitigate the risk inherent in earning alpha by selling options. In addition to a range of analytics that the

Portfolio Management team employs in assessing the Portfolio's risk exposure, portfolio risk is mitigated by two approaches: (i) the Hedging Positions mentioned above (e.g., deep out-of-the-money S&P long puts); and (ii) the restructuring of the Range-Bound Spreads and Directional Spreads and other positions.

100.    With respect to the purported operation of AllianzGI's "second line of defense," the July 2020 Memo stated that their Enterprise Risk Management team purportedly ran "daily" "quantitative portfolio risk tests" that "focus[ed] on predictive indicators that assess how the Portfolio is positioned for defined, *single day* stresses, which are based on historically-viewed worst case scenarios."

101.    With respect to its "third line of defense," the July 2020 Memo simply stated: "[W]e can confirm that both the Structured Products Portfolio Management team and the Enterprise Risk Management team have been subject to AllianceAM Internal Audit reviews that were in part focused on portfolio risk within the standard audit cycle" and that "[t]hese audits resulted in no material findings."

## A.    The July 2020 Memo's Incongruous Explanations for Why the Fund's Purported Hedging Strategies Failed

102.    The July 2020 Memo's explanation of why AllianzGI's Structured Alpha Portfolios' hedging strategies failed to avert catastrophe in March 2020 were, however, incongruous and deeply troubling.

103.    First, AllianzGI now claimed, for the first time, that its "back-stop" Hedging Positions were intended to offer only "*some* protection in the case of a *very short-term market crash*." As the July 2020 memo now asserted:

The Hedging Positions are designed to offer *some protection* in the case of a *very short-term market crash*. These positions are *not* intended to provide broader protection against all market downturns, *particularly downturns that transpire over longer periods of time*, and therefore would not offset substantially the losses from the Range Bound Spread positions.

42

104.    Remarkably, the July 2020 Memo then went on to clarify that, when AllianzGI stated that the Hedging Positions were designed to offer "some protection" in the case of a "very short-term market crash," AllianzGI was specifically equating a "very short-term market crash" to a ***one-day* crash.**  As the July 2020 Memo stated:

> As noted above, the Hedging Positions are designed to provide protection to the Portfolio against a sudden market crash and volatility increase. ***Given that the market decline coupled with the surge in volatility was a multi-week move as opposed to a one-day shock***, the hedges in the form of S&P 500 long puts did not appreciate in value nearly enough to offset the losses in the core alpha-generating positions. The S&P 500 long puts were deliberately constructed with options that were both of relatively short expiration and far out of the money to protect against a ***one day market shock***. Therefore, these puts did not appreciate as quickly in value as they might in the case of a sudden market crash. The value of the long puts increases with the increase in volatility and the long S&P 500 put positions were constructed to increase considerably in the case of a sudden surge in volatility to protect the portfolio. However, volatility in the recent period took several weeks to reach its peak in the middle of March, so legacy long puts had lost effectiveness due to time elapse, and more recent long puts had been relayered incrementally further out-of-the-money along with new short puts. ***This resulted in the Hedging Positions appreciating in value, but not enough to cover the losses.***

***Indeed, the July 2020 Memo conceded that the Fund's Hedging Positions had been all but useless in protecting the portfolio***, as they contributed "gains of only 5%" – as compared to the Fund's overall performance in the March 2020 quarter (after taking into account the Hedging Position's 5% gains) of ***catastrophic losses of roughly 75%.***

105.    As noted above, as a threshold matter, AllianzGI's statements regarding its purported hedging activities were jarring because AllianzGI had not previously disclosed to its investors that the Fund's short-put hedging positions were designed only to hedge against "one-day shocks."  For example, in the 2017 Due Diligence Materials, AllianzGI had affirmatively represented that the Fund's "tail-risk protection" included "***hedging not only for a single-day market crash, but also for a significant multi-day or multi-week decline***."  Similarly, AllianzGI's 2018 Investor Presentation stated that the "primary objective" of the Fund's Hedging Positions

was to "protect the [Fund]" from "a short-term equity-market crash," which it defined as "a decline of 10% to 15% in less than 5 days."  Given that the 2018 Investor Presentation elsewhere described the Fund's Hedging Positions as being "[d]esigned to protect the portfolio in the event of a market crash," a reasonable investor would have understood that, although the Fund's Hedging Positions may have been designed ***primarily*** to protect against a crash that occurred over one to five days, they would ***also*** provide significant protection against more protracted crashes involving multi-week declines.

106.   Indeed, it would have been wildly imprudent and nonsensical for a portfolio like the Fund's to be "deliberately constructed" to protect against "severe market disruptions" using options that would provide meaningful protection ***only*** against "one day crashes."  Given that markets frequently "crash" over multiple days or weeks before hitting bottom, for the Fund to have had protection against only "one-day crashes" makes about as much sense as buying insurance that covers only property damage suffered during the first 15 minutes of a fire, or that covers only accidents where the other vehicle is a sedan (but not an SUV or a truck).

107.   Similarly, if the representations of the July 2020 Memo concerning AllianzGI's "independent" Enterprise Risk Management function were true, AllianzGI's risk management systems were laughably inadequate because (according to the July 2020 Memo) they "focus[ed] on predictive indicators that assess how the portfolio is positioned for ***defined, single day stresses,*** which are based on historically-viewed worst case scenarios."  That AllianzGI's "independent" risk management oversight of the Portfolio Management team was, at any given time, focused on the Fund's risk over a time horizon that extended ***only 24 hours into the future***, speaks for itself in terms of its (im)prudence and (in)adequacy.

108.    Moreover, even if AllianzGI had (contrary to fact) somehow disclosed that its Hedging Positions were designed to be effective only against "one-day crashes," the declines experienced in March 2020 *were* primarily composed of a series of significant "one-day shocks" that did not occur on consecutive days.  For example, on March 9, 2020, the S&P 500 Index dropped 7.6% (but rallied by 4.9% the next day); on March 12, the S&P 500 Index dropped 9.51% (but rallied the next trading day by 9.3%); and on March 16, the S&P 500 Index dropped almost 12% (but rallied the next day by 6.0%).  Accordingly, even if the Fund's hedging strategies had been designed to provide protection *only* against "one-day shocks," AllianzGI's July 2020 Memo would *still* fail to explain why the Fund's hedging strategy failed to protect the Fund against catastrophe in March 2020.

109.    The July 2020 Memo also failed to explain why – despite AllianzGI having affirmatively represented, as recently as January 2020, that "the Structured Alpha's option portfolio *is positioned for a __strong improvement__ in the event of another February 2018-type move*" – the Fund's value *collapsed* in the first quarter of 2020.  In particular, the last week of February 2020 (when the VIX jumped to 40.11 and the S&P 500 fell 11.5%) replicated to an uncanny degree the events of early February 2018 (when the VIX jumped to 37.32 and the S&P 500 fell 8.5% over four days and 10.0% over nine days).  Accordingly, the Fund should have been in a *stronger* position by the end of February 2020 than it had been a week earlier at the start of the crash.  Yet, the July 2020 Memo nowhere explains why the Fund was somehow unable, or unwilling, to reinvest profits amassed in late February 2020 into the acquisition of *new* Hedging Positions that could similarly protect the Fund against the further shocks that would be experienced beginning on March 5.  In such circumstances, the July 2020 Memo's statement that "volatility in the recent [late February to mid-March 2020] period took *several weeks* to reach its peak in the

middle of March, so legacy long puts had lost effectiveness due to time elapse," simply begs the question of why – particularly given the brief recovery the S&P 500 experienced over the first three trading days of March 2020 (March 1 to March 3) – AllianzGI did not adjust its long put Hedging Positions so that the Fund would have been protected against the renewed string of further market declines (including some sharp one-day declines) that would occur over the next nine trading days (March 4 to 16).

110.    The July 2020 Memo appears to have anticipated this question, but once again, AllianzGI's "answers" (even if accepted as true) simply provide additional grounds for finding that it acted with deliberate, reckless, or (at best) negligent indifference towards protecting the Fund's value in the face of a market crash.  Specifically, the July 2020 Memo first sought to deflect away from the inadequacy of the Fund's ***Hedging Positions*** by stating as follows:

> ***The risks posed by market downturns such as February-March 2020 are primarily addressed by the restructuring of options positions***. Restructuring is a process of risk of risk mitigation by which the Portfolio Management team adjusts the Portfolio to market moves by closing out a portion of the options that serve as the Portfolio's core alpha generators [*i.e.*, the Range-Bound Spread and Directional Spread options] ***and replacing them with new positions with strike prices further out of the money***, for example. Over the years, restructuring has served as a vital component of the Portfolio Management team's risk mitigation process, allowing the Portfolio to dynamically manage risk while still pursuing its funds' respective stated alpha targets – a process that has been explained at length to all investors.

111.    The July 2020 Memo then tried to argue that appropriate "restructuring" efforts were undertaken.  More specifically, the July 2020 Memo stated as follows:

> **The recent market downturn**
>
> Restructuring [of the Funds] had historically been relatively limited as a percentage of total Portfolio positions. However, as equity markets declined and volatility increased into March 2020, per the strategy's design, the portfolio managers implemented multiple rounds of restructuring trades.[14] For example, as markets declined the Portfolio Management team replaced near-to-the-money short S&P

---

[14]    The July 2020 Memo referenced four instances of "restructuring" of the Structured Alpha 1000 fund, which apparently occurred on March 4, 6, 12, and 13, 2020.

500 puts and short NASDAQ puts with new short puts struck at prices further away from then-current market levels. While re-establishing alpha-generating positions at lower strike prices, this resulted in realized losses on the near-to-the-money short puts. . . . In some instances, this restructuring was repeated on subsequent days on legacy positions and on positions that represented the new restructured legs. Despite these steps, the Portfolio ultimately could not be restructured quickly enough to keep pace with the market decline, resulting in additional losses.

112.    However, the July 2020 Memo conspicuously failed to explain **why**, if AllianzGI had, in fact, acted prudently and appropriately, AllianzGI had nonetheless failed to prevent the Funds from suffering catastrophic losses.  In particular, Plaintiff's consulting experts believe there is no reasonable basis for a finding that "the Portfolio could not have been restructured quickly enough" to avoid the kinds of catastrophic losses that the Fund ultimately suffered.  This is primarily because (i) the market decline that occurred between February 21 and March 23, 2020 – though severe – played out over a month-long period; (ii) the market for buying and selling options on the S&P 500 continued to function normally throughout this period, and to process heavy trading volume of these instruments in a highly efficient manner and at prices that were consistent with standard industry models and algorithms for pricing such instruments; and (iii) there was simply no excuse for AllianzGI – in an era of modern computers, exceptionally efficient and liquid S&P 500 options markets, and the ability to accurately calculate the value of any given option contract at any given future point in time (based on whatever combination of pricing and volatility assumptions that one might care to model) – not to have appreciated, in real time, the extent to which the Fund's portfolio was falling materially "out of balance."

113.    In sum, AllianzGI either knew, or should have known, at all relevant times, the S&P 500-level around which the Fund's "Range Bound" and "Directional" spread strategies were centered; whether and to what extent the market had moved towards the "downside" boundary of the Fund's "profit zone"; what trades it needed to execute to "re-center" the Fund's portfolio in response to changes in the level of the S&P 500; and how relatively far – or how relatively little –

markets would have to continue to move in an adverse direction before the Fund would suffer losses, and ultimately ***catastrophic*** losses.  Although markets may have moved too quickly and too adversely to prevent the Fund from suffering ***any*** losses during the February/March 2020 upheavals, there was simply no excuse for AllianzGI's failure to take timely, appropriate, prudent, and ***adequate*** restructuring of its Range Bound, Directional Spread, and Hedging Positions so as to protect the Fund from anything close to the kind of catastrophic 75% losses that it actually suffered during this period.

114.   This conclusion is further reinforced by the fact that although numerous non-AllianzGI hedge funds have options-based investment strategies that are fundamentally similar to those that Defendants purported to follow, none of those other funds suffered losses of remotely the same magnitude that the Fund did during the February/March 2020 period.

115.   Whether AllianzGI actually took ***any*** steps to mitigate the Fund's risk, as described in AllianzGI's July 2020 Memo, remains to be determined following discovery.  As set forth above, however, whatever steps it did take were patently inadequate, its risk management policies and practices were laughably deficient, and its culpable acts and omissions, as alleged herein, were committed knowingly, recklessly, or (at best) negligently and in breach of AllianzGI's fiduciary and contractual duties to Plaintiff and the Class.[15]

---

[15]     The July 2020 Memo also disclosed that of the losses suffered by one of AllianzGI's other Structured Alpha funds – the Structured Alpha 1000 fund – roughly 67% of those losses "were caused by S&P 500 put options" and roughly 25% of the losses "were caused by short VIX and VXX options."  Absent discovery, Plaintiff is not in a position to determine the extent to which the Fund's losses were exacerbated by AllianzGI's imprudent or reckless management of any VIX and/or VXX options (which are generally more volatile, and risky, than S&P 500-based options).  In any event, it can be reasonably inferred from the July 2020 Memo that the clear bulk of the massive losses suffered by the Fund resulted from losses on its S&P 500 options trades – and that the Fund's long put "Hedging Positions" were not remotely sufficient to protect the Fund.  *See* July 2020 Memo at 4 (noting, with considerable understatement, that the losses suffered in the Structured Alpha 1000 fund were only "partially offset by gains generated by the fund's protective S&P 500 long puts . . . which contributed gains of approximately ***5%***, modestly offsetting losses").

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action as a class action on behalf of all persons and entities who purchased or otherwise acquired limited liability company interests in the Fund at any time and who held those interests through March 31, 2020 (the "Class").  Excluded from the Class are Defendants and their officers, directors, employees, affiliates, legal representatives, predecessors, successors, and assigns, and any entity in which any of them has a controlling interest or is a parent.

117.    The members of the Class are so numerous that joinder of all members is impracticable.  Although the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that the number of Class members exceeds 100 and that joinder would be impracticable.  Record owners and other members of the Class may be identified from records maintained by AllianzGI and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

118.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact that are common to the Class include:

(a)    Whether AllianzGI breached its common fiduciary duties to the members of the Class;

(b)    Whether AllianzGI breached its common contractual obligations to the members of the Class, as set forth in the Offering Documents;

(c)    Whether AllianzGI breached its implied duty of good faith and fair dealing to the members of the Class;

(d)    Whether AllianzGI managed the Fund in a negligent manner;

(e)     Whether AllianzGI's common statements in the PPM, quarterly Client Commentaries, and investor PowerPoint presentations were materially false and misleading;

(f)     Whether AllianzGI's common misstatements or omissions to members of the Class were made with knowledge of or reckless disregard for the truth or negligently; and

(g)     To what extent Class members have suffered damages and the proper measure of damages.

119.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by AllianzGI's wrongful conduct that is complained of herein.

120.    Plaintiff is an institutional investor that will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in complex class and securities litigation.  Plaintiff has no interests that are in conflict with or otherwise antagonistic to the interests of the other Class members.

121.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.

## DERIVATIVE LIABILITY OF CERTAIN DEFENDANTS

122.    Under the doctrine of *respondeat superior*, Defendants Allianz SE, AAM GmbH, Allianz of America, Allianz AMA Holdings, Allianz AMA LLC, Allianz AMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI because each of them had the power to influence and control, and did influence and control, directly or indirectly, the acts of AllianzGI.

123.    Defendants also each acted in a joint enterprise by, among other things, holding out the management of the Funds as being conducted through the operation of "Allianz Global Investors." In so doing, they acted as each other's agents and acted for the benefit of Allianz SE and under its ultimate authority and control.

124.    As a direct and proximate result of the actions and omissions by Defendants, as set forth herein, Plaintiff and Class members have sustained actual damages in an amount to be proven at trial.

**FIRST CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

125.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

126.    AllianzGI, as Managing Member of the Fund, owed fiduciary duties to the Fund's investors, including Plaintiff and Class members.

127.    In addition, the Offering Documents appointed AllianzGI as representative and attorney-in-fact for Plaintiff and Class members with respect to the Fund, a designation that imposed the fiduciary duty of loyalty on the attorney-in-fact.

128.    AllianzGI had an obligation to carry out its fiduciary duties with respect to the Fund with the care, skill, prudence, and diligence under the circumstances then-prevailing that a prudent person acting in a like capacity, and with experience and familiarity with options trading, portfolio strategy, and market risks, would use in a similar situation. Here, that meant that AllianzGI was required, among other things, to have the trading sophistication and proficiency to reasonably protect Fund assets in a wide range of market conditions, including those that existed in February and March 2020, and to prudently respond in the face of adverse market changes.

129.   AllianzGI breached these fiduciary duties by causing the Fund to increase its leverage and tighten its spreads in order to maximize potential alpha returns (thereby increasing the fees paid to AllianzGI from Fund assets), at the expense of appropriate risk management and the interests of Plaintiff and the other members of the Class.

130.   AllianzGI further breached its fiduciary duties by effectively abandoning any meaningful efforts to implement and maintain the hedging strategy that it was supposed to have in place, or to implement any other prudent risk protections, thereby exposing the Fund to catastrophic (but readily avoidable) losses.

131.   AllianzGI further breached its fiduciary duties by concealing material information from Plaintiff and Class members, including that: (i) AllianzGI was disregarding or abandoning the Fund's strategy and risk controls, as set forth in the Offering Documents; and (ii) AllianzGI had caused the Fund to imprudently increase its leverage and "tighten its spreads" at the expense of proper risk controls – and that Allianz did so in pursuit of its own financial interests and at the expense of the best interests of Plaintiff and the other members of the Class.

132.   AllianzGI further breached its fiduciary duties when, during February and March 2020, it failed to take meaningful steps to protect the Fund in that, for example and most conspicuously, it failed to act prudently to timely and adequately restructure the Fund's options positions and to meaningfully increase the Fund's Hedging Positions in reasonably protective "long put" positions.  As market conditions worsened in the first quarter of 2020, AllianzGI was increasingly motivated to commit such breaches because AllianzGI would likely have been unable to earn any fees from Plaintiff or Class members for the foreseeable future if it had acted prudently to exit and restructure losing options positions and caused the Funds to incur the costs of restructuring its Hedging Positions – whereas the reckless alternative of relying on a speedy

reversal of adverse market movements to avoid catastrophe (while plainly not in the best interests of Plaintiff or the other members of the Class) offered AllianzGI the greater likelihood of being able to continue to receive lucrative "incentive allocation" fees from Fund investors (and to avoid locking in losses that would trigger "high water mark" fee provisions that were highly adverse to AllianzGI's financial interests).

133.    As a direct and proximate result of the acts and omissions of AllianzGI, as set forth above, Plaintiff and the members of the Class have sustained actual damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

134.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

135.    As described above, the Offering Documents, including the Subscription Agreement, LLC Agreement, and PPM, constitute valid and binding contracts that are enforceable against AllianzGI.

136.    The LLC Agreement required AllianzGI to invest the Fund's assets in accordance with the terms of the PPM and the investment strategies set forth therein.

137.    The PPM represented that the Fund, as managed by AllianzGI, would employ an investment strategy that included the use of appropriate hedging strategies and strict risk controls to limit risk and preserve capital.

138.    AllianzGI breached the Offering Documents by not investing the financial capital provided by Plaintiff and Class Members in accordance with the promised investment strategy, as set forth above and as evidenced by the Fund's catastrophic collapse in value in March 2020.

139.   The LLC Agreement provided that AllianzGI would be liable to the Fund's investors for "any acts or omissions arising out of or in connection with the Company" that are "made in bad faith" or that constitute "willful misconduct or negligence."

140.   AllianzGI breached its contractual agreements with Plaintiff and the other members of the Class, as embodied in the Offering Documents, by failing to manage the Fund prudently, including through, among other things: (i) its imprudent use of increased leverage and "tightening of spreads" in pursuit of increased incentive fees; (ii) its failure to implement and adhere to reasonable or prudent risk management controls and practices; and (iii) its failure to take meaningful steps to protect the Fund prior to and during the February to March 2020 period to timely and adequately restructure the Fund's options positions and meaningfully increase the Fund's Hedging Positions in reasonably protective "long put" positions, as markets moved adversely to the Fund's overall portfolio.

141.   Plaintiff and the Class have suffered damages as a result of these breaches of the Offering Documents in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing)

142.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

143.   To the extent that AllianzGI's acts and omissions, as alleged above, did not constitute breaches of its contractual obligations to Plaintiff and the other members of the Class under the Offering Documents, AllianzGI's acts and omissions breached its implied duties of good faith and fair dealing to Plaintiff and the other members of the Class.

144.   For example, AllianzGI breached its duties of good faith and fair dealing by, among other things, knowingly and recklessly exposing the Fund and its investors to significant risk of

catastrophic loss and by abandoning the kind of prudent risk controls and hedging strategies that any reasonable investor (or reasonable fund manager) would have understood to be in place for an options-based fund of the type that the Fund purported to be.

145.    AllianzGI's culpable acts and omissions in failing to prudently manage the Fund and adhere to reasonable risk management and hedging strategies were impliedly proscribed by the terms of the Offering Documents.  Moreover, AllianzGI's culpable acts and omissions, as alleged above, were not taken in good faith, but were instead motivated by AllianzGI's financial interest in trying to maximize its receipt of incentive fees from the Fund (and, in March 2020, to avoid locking in losses that would trigger "high water mark" fee provisions that were highly adverse to AllianzGI's financial interests).

146.    As a result of AllianzGI's breaches of its implied duties of good faith and fair dealing, Plaintiff and the other members of the Class have suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Negligence)

147.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

148.    As Managing Member of the Fund, AllianzGI owed a duty of care to Plaintiff and Class members based on the special relationship, or "privity," arising out of the Offering Documents.

149.    In addition, the PPM expressly provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund under the Operating Agreement."

150.    The LLC Agreement further provided that AllianzGI would be liable to the Fund's investors for "any acts or omissions arising out of or in connection with the Company" that are "made in bad faith" or that constitute "willful misconduct or negligence."

151.    AllianzGI breached its duty to Plaintiff and Class members by failing to exercise reasonable care in properly protecting the Fund against a severe market downturn of the type that caused the value of the Fund's portfolio to collapse in March 2020.

152.    For example, AllianzGI breached its duty of care to Plaintiff and the other members of the Class by failing to manage the Fund prudently through, among other things: (i) its use of imprudently increased leverage and "tightening of spreads" in pursuit of increased incentive fees; (ii) its failure to implement and adhere to reasonable or prudent risk management controls and practices; and (iii) its failure to take meaningful steps to protect the Fund prior to and during the February to March 2020 period to timely and adequately restructure the Fund's options positions and meaningfully increase the Fund's Hedging Positions in reasonably protective "long put" positions, as markets moved adversely to the Fund's overall portfolio.

153.    As a result of AllianzGI's negligence, Plaintiff and the other members of the Class have suffered damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

154.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

155.    In its common communications with Plaintiff and Class members, including in the PPM and quarterly Client Commentaries, AllianzGI made numerous false and misleading statements and omitted and concealed material information concerning, among other things: (i) the Fund's investment strategy; (ii) the Fund's risk management policies and practices, (iii) the Fund's

policies and practices with regard to leverage and borrowing on a gross and/or net basis; and (iv) the Fund's purported preparedness to profit not only in flat or rising markets, but even in (if not especially in) declining markets that experienced "severe market disruptions."

156.     AllianzGI owed Plaintiff and Class members a duty of truthfulness and candor as a registered investment adviser.

157.     AllianzGI similarly owed duties to Plaintiff and Class members, as investors in the Fund, to make full, timely, and complete disclosures of the Fund's material investment and risk management policies and practices, and of any changes to, or substantial abandonment of, such policies or practices.

158.     As alleged above, AllianzGI made materially false or misleading representations to Plaintiff and Class members with reckless indifference to the truth, or with knowledge or belief that its representations were false or misleading, knowingly or recklessly concealed material adverse facts, and was silent in the face of a duty to provide adequate disclosure to Plaintiff and Class members regarding, among other things: (i) the Fund's investment strategy; (ii) the Fund's risk management policies and practices; (iii) the Fund's policies and practices with regard to leverage and borrowing on a gross and/or net basis; and (iv) the Fund's purported preparedness to profit not only in flat or rising markets, but even in (if not especially in) declining markets that experienced "severe market disruptions."

159.     AllianzGI's materially false and misleading representations, concealment, and/or silence induced Plaintiff and Class members both to invest in the Fund and forbear from redeeming their investments in the Fund.

160. Plaintiff and the other members of the Class justifiably relied upon AllianzGI's materially false representations, concealment, and/or silence, which induced them to invest in the Fund and/or forbear from redeeming their investments in the Fund.

161. As a direct and proximate result of AllianzGI's materially false and misleading statements, culpable omissions, and concealment of adverse material information, Plaintiff and the other members of the Class have suffered, and will continue to suffer, economic and non-economic losses in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

162. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

163. AllianzGI owed a duty of care to Plaintiff and Class members arising out of its special relationship as Managing Member of the Fund. Plaintiff and Class members are in privity with AllianzGI or have a bond so close as to approach that of privity.

164. AllianzGI owed Plaintiff and Class members a duty of truthfulness and candor as a registered investment adviser.

165. AllianzGI knew, or should have known, in the exercise of due care, that the information communicated to Plaintiff and Class members concerning: (i) the Fund's investment strategy; (ii) the Fund's risk management policies and practices; (iii) the Fund's policies and practices with regard to leverage and borrowing on a gross and/or net basis; and (iv) the Fund's purported preparedness to profit not only in flat or rising markets, but even in (if not especially in) declining markets that experienced "severe market disruptions" were all materially incorrect or misleading.

166.    AllianzGI knew that Plaintiff and the other members of the Class would rely on its representations in connection with their investments in the Fund.

167.    Plaintiff and the other members of the Class justifiably relied to their detriment on AllianzGI's false and misleading communications.

168.    But for the negligent misrepresentations and omissions of AllianzGI, Plaintiff and the other members of the Class would not have purchased their interests in the Fund and/or would have redeemed their interests in the Fund.

169.    As a result of AllianzGI's negligent misrepresentations and omissions and related breaches of its duty of truthfulness and candor, Plaintiff and Class members lost nearly the entirety of their investments.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands relief as follows:

A.    An order certifying this class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    A judgment awarding actual damages in favor of Plaintiff and the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.    A judgment awarding punitive damages in favor of Plaintiff and the Class against Defendants in an amount to be determined at trial;

D.    A judgment awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E.    Any other and further relief this Court considers just and proper.

DATED:  September 2, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 */s/ William C. Fredericks*
William C. Fredericks

59

Donald A. Broggi
Zachary M. Vaughan
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
zvaughan@scott-scott.com

*Attorneys for Plaintiff Teamster Members
Retirement Plan f/k/a GCIU Inter-Local
Pension Plan*