**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TEAMSTER MEMBERS RETIREMENT PLAN f/k/a GCIU INTER-LOCAL PENSION PLAN; BOARD OF TRUSTEES OF TEAMSTER MEMBERS RETIREMENT PLAN; BRICKLAYERS AND MASONS' LOCAL UNION NO. 5, OHIO PENSION FUND; BOARD OF TRUSTEES OF BRICKLAYERS AND MASONS' LOCAL UNION NO. 5, OHIO PENSION FUND; and RASMANI BHATTACHARYA and CLAUDE PUMILIA, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:20-cv-07154-KPF  <br><br> **SECOND AMENDED COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiff, | |
| v. | |
| ALLIANZ GLOBAL INVESTORS U.S. LLC, | |
| Defendant. | |

Plaintiffs Teamster Members Retirement Plan f/k/a GCIU Inter-Local Pension Plan (the "Teamsters Fund"), Board of Trustees of Teamster Members Retirement Plan (the "Teamsters BOT"), Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund (the "Bricklayers Fund"), Board of Trustees of Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund (the "Bricklayers BOT"), and Rasmani Bhattacharya and Claude Pumilia, individually and on behalf of all others similarly situated, for their Complaint against Defendant Allianz Global Investors U.S. LLC ("AllianzGI"), respectfully allege as follows:

**NATURE OF THE ACTION**

1. This is a case about how AllianzGI's breaches of contract, violations of fiduciary duty, imprudent investment management, negligence, and other wrongful acts and omissions led

to the collapse of a group of related hedge funds and the evaporation, almost overnight, of over a billion dollars of its investors' money.

2.     Defendant AllianzGI is the Managing Member of Structured Alpha US Equity 500 LLC (the "US Equity 500 Fund"), Structured Alpha 1000 LLC (the "1000 Fund") and Structured Alpha 1000 Plus LLC (the "1000 Plus Fund," and together with the US Equity 500 Fund and the 1000 Fund, the "Named Funds"), three members of Allianz's broader "Structured Alpha" family of hedge funds (collectively, the "Alpha Funds," as further identified in fn. 3 below) that AllianzGI had developed.  Each Alpha Fund was purportedly designed to outperform a defined benchmark index (the S&P 500 in the case of the US Equity 500 Fund, and the Merrill Lynch/BofA 3-Month U.S. Treasury Bill Index (the "3-Month Treasury Bill Index") in the case of the 1000 Fund and 1000 Plus Fund) by a certain percentage amount each year, with the "outperformance" being generated from excess returns ("alpha") from the buying and selling of options.  In its offering documents and marketing materials for the Alpha Funds, AllianzGI assured investors that its investment strategy was "designed to outperform whether equity markets are up or down, smooth or volatile" and that the Alpha Funds' assets would be "protect[ed] against a market crash" by a sophisticated "hedging" strategy.  Indeed, in 2020 – just weeks before the Alpha Funds (including the Named Funds) imploded – AllianzGI specifically assured the investors that the Funds were "as prepared as ever in the event of a severe market dislocation" and that the "Structured Alpha option portfolio" was actually "***positioned for a strong improvement***" in the event of a "violent correction and volatility surge" of the type that had occurred two years earlier in February 2018 (when the S&P 500 had fallen sharply and market volatility had spiked over the course of a two-week period).[1]

---

[1]     Unless otherwise stated, all emphasis in quoted materials is added.

3.      In late February and early March 2020, equity markets did, in fact, experience another "violent correction and volatility surge" that was remarkably similar to what had occurred two years earlier in February 2018.  But far from being "positioned for a strong improvement" in this scenario, the Alpha Funds (including the Named Funds) were actually positioned for catastrophic disaster – and instead of prudently managing the Alpha Funds to "protect [investors] against a market crash" as increasingly volatile markets continued to decline, Defendant AllianzGI essentially: (i) abandoned the Alpha Funds' risk controls and meaningful downside hedging strategies; and (ii) recklessly "rolled the dice" in the hope that adverse market trends would quickly reverse course before the Alpha Funds would have to recognize devastating losses.  AllianzGI's reckless throw of the dice in the late winter of 2020 – and its abject failure to meaningfully "re-balance" its positions or acquire more than token hedging positions (despite having had plenty of time to do so) – proved to be a fool's bet **and resulted in catastrophic losses** for the Alpha Funds' investors.  Indeed, by the end of the spring of 2020, investors in the US Equity 500 Fund had suffered losses of over 75%, and investors in the 1000 and 1000 Plus Funds were left to collect mere pennies on the dollar after they suffered even greater losses.  In the wake of their collapse, AllianzGI decided to **liquidate** all or most of the Alpha Funds, including all three Named Funds.

4.      It appears that AllianzGI's extreme risk taking – to the extent it was not the product of mere recklessness, negligence, and incompetence – was motivated by the incentives created by the Alpha Funds' fee structure.  Under each Alpha Fund's fee structure, the **only** fee that AllianzGI (as "Managing Member") could collect from investors was an "incentive allocation" fee equal to 30% of the amount by which each Alpha Fund outperformed its respective benchmark index (the "alpha returns").  Each Alpha Fund's fee structure also included what AllianzGI referred to as a "cumulative high water mark" feature, which provided that if an investor's account were to

underperform compared to its benchmark index, that investor would not owe *any* more fees to AllianzGI until the value of that investor's account returned to, and increased above, its previous "high water mark."

5.      Unfortunately for investors, as the events of late February and March 2020 played out, this fee structure put AllianzGI in an increasingly conflicted position because, as markets continued to move against the Alpha Funds' positions (and as the costs of meaningfully reducing each Alpha Fund's risk exposure to prudent levels increased with each passing day), by early March 2020, the paper losses already incurred by the Alpha Funds meant that it would likely be at least a year before the value of any Alpha Fund (including the Named Funds) would bounce back to their previous "high water marks" so as to allow AllianzGI to collect fees again.  Accordingly, rather than lock in relatively small losses to "protect [investors] against a market crash," in the late winter of 2020, AllianzGI was instead incentivized to recklessly gamble – *with its investors' money* – that a favorable and prompt change in the investment winds would save the Alpha Funds and put their portfolios back into profitable territory without incurring the costs of the kind of meaningful re-balancing and hedging efforts called for by prudence and the Alpha Funds' own purported risk-management strategies.  Taking such a reckless gamble with its *investors'* money may have been the best risk-adjusted option *for AllianzGI* to take (since AllianzGI would maximize its ability to continue to collect lucrative incentive fees going forward if markets had quickly reversed course) – but, predictably, it left the Alpha Funds increasingly exposed to *catastrophic* losses.  By the end of March 2020, the US Equity 500 Fund's investors had lost *over 75%* of their money (nearly $1 *billion*), and 1000 and 1000 Plus Funds suffered even greater percentage losses – and by the summer of 2020 all three of these Funds (as well as all or most of the other Alpha Funds) were *liquidated*, leaving their investors with mere pennies on the dollar.

6.      By this action, Plaintiffs seek, on behalf of themselves and all others similarly situated, to recover the damages caused by AllianzGI's breaches of its contractual and fiduciary duties to the Alpha Funds' investors, its negligence, and its breaches of its statutory duties under the Employee Retirement Income Security Act ("ERISA").

## THE PARTIES

7.      Plaintiff Teamster Members Retirement Plan f/k/a GCIU Inter-Local Pension Plan (the "Teamsters Fund") is a 501(c)(18) employee-funded defined benefit plan with its principal place of business in Carol Stream, Illinois.  The Teamsters Fund invested in the US Equity 500 Fund.

8.      Plaintiff Board of Trustees of Teamster Members Retirement Plan (the "Teamsters BOT") is the fund administrator of the Teamsters Fund.  The Teamsters BOT is the named fiduciary of the Teamsters Fund under ERISA §§ 3(16)(A) and 402(a)(2) (29 U.S.C. §§ 1002(16)(A) & 1102(a)(2)).  The Teamsters BOT oversees the administration of the Teamsters Fund and is authorized and empowered to bring suit on behalf of the Teamsters Fund.

9.      Plaintiff Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund (the "Bricklayers Fund") is a defined benefit plan with its principal place of business in Valley View, Ohio.  The Bricklayers Fund invested in the 1000 Fund through a trust, the Marco Consulting Group Trust I (the "Marco Trust"), which (as AllianzGI knew or recklessly disregarded) was designed to facilitate the investment of pension funds (such as the Bricklayers Fund) in certain Structured Alpha Funds.

10.     Plaintiff Board of Trustees of Bricklayers and Masons' Local Union No. 5, Ohio Pension Fund (the "Bricklayers BOT") is the fund administrator of the Bricklayers Fund.  The Bricklayers BOT is the named fiduciary of the Bricklayers Fund under ERISA §§ 3(16)(A) and 402(a)(2) (29 U.S.C. §§ 1002(16)(A) & 1102(a)(2)).  The Bricklayers BOT oversees the

administration of the Bricklayers Fund and is authorized and empowered to bring suit on behalf of the Bricklayers Fund.

11.     Plaintiffs Rasmani Bhattacharya and Claude Pumilia (the "Pumilia-Bhattacharyas"), are citizens of the State of Colorado.  The Pumilia-Bhattacharyas invested in the 1000 Plus Fund.

12.     Defendant AllianzGI is a Delaware limited liability company with its principal place of business at 1633 Broadway, 43rd Floor, New York, New York 10019.  AllianzGI is registered as an investment adviser under the Investment Advisers Act of 1940.  As the Managing Member of the Alpha Funds, AllianzGI directly controlled the Alpha Funds at all relevant times and communicated directly with the Alpha Funds' investors regarding the investment portfolios, their performance, their risk controls, and other essential information.

**THE TOLLED ENTITIES**

13.     Pursuant to the Court-ordered Case Management Plan ("CMP") applicable to this action dated December 7, 2020 (ECF No. 49), on December 11, 2020, the then-named plaintiffs voluntarily dismissed Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings"), Allianz Asset Management of America L.P. ("Allianz AMA LP"), Allianz Asset Management of America LLC ("Allianz AMA LLC"), PFP Holdings Inc. ("PFP"), and Allianz Asset Management of America Holdings Inc. ("Allianz AMA Holdings," and collectively with AllianzGI Holdings, Allianz AMA LP, Allianz AMA LLC, and PFP, the "Tolled Entities"), subject to certain tolling arrangements (see ECF No. 51).  But for those tolling arrangements, the Tolled Entities would be named herein as additional defendants, and the fact that no claims are asserted against the Tolled Entities in this Second Amended Complaint should not be construed in any way so as to waive, limit, or otherwise reduce in any respect any named plaintiff's or any class member's rights under

the tolling arrangements reflected in the CMP or in the December 11, 2020 stipulation of voluntary dismissal.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §1332(d)(2)(A) because this case is a class action in which the aggregate claims of all Class members exceed $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state different from AllianzGI.

15.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367, and under ERISA § 502(e)(1) (29 U.S.C § 1132(e)(1)).

16.     Venue is proper in this District under 28 U.S.C. §1391(b) because the actions that AllianzGI undertook in managing the Alpha Funds, including the Named Funds, took place in this District.  In addition, AllianzGI has consented to the jurisdiction of this Court in Article VI of the Subscription Agreements that AllianzGI entered into with each Plaintiff (or, in the case of the Bricklayers Fund, with the Marco Trust acting on its behalf), which provides that "in the event of any dispute arising out of the terms and conditions of this Subscription Agreement, the parties hereto consent and submit to the jurisdiction of the courts of . . . the U.S. District Court for the Southern District of New York."

17.     Venue is also proper in this district under ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)).

## FACTUAL BACKGROUND

**I.     The Nature of the Alpha Funds, AllianzGI's Representations to Investors, and AllianzGI's Contractual and Fiduciary Duties to Plaintiffs and the Class**

18.     Investors in each Alpha Fund, including Plaintiffs (or, in the case of the Bricklayers Fund, the Marco Trust acting on its behalf), were required to execute a Subscription Agreement,

which incorporated the terms of (i) a Limited Liability Company Agreement (the "LLC Agreement"); and (ii) a Confidential Private Placement Memorandum (the "PPM," and collectively with the LLC and Subscription Agreements, the "Offering Documents").[2]

19.     Each LLC Agreement provided that AllianzGI would serve as the "Managing Member" of the relevant Alpha Fund.  As Managing Member, AllianzGI was authorized to "conduct the day-to-day administration" of the relevant Alpha Fund, and it had "the power on behalf and in the name of the [Alpha Fund] to carry out any and all of the objects and purposes" of the Alpha Fund and to "perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto."

20.     Each LLC Agreement also appointed AllianzGI as the "investment manager" of the relevant Alpha Fund.  As investment manager, AllianzGI's duties included, among other things, "advising regarding the purchase and sale of investments" and "managing the Company's [*i.e.*, the relevant Alpha Fund's] assets."

21.     Each LLC Agreement also provides that AllianzGI, as Managing Member, may be held liable to the Alpha Fund's investors (or "Members") for "any acts or omissions arising out of or in connection with the [Alpha Fund]" that are "made in bad faith" or that constitute "willful misconduct or negligence."

22.     Each LLC Agreement also provided that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as investment manager of the Company, shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal

---

[2]     Except where otherwise indicated herein, the provisions of the Offering Documents for the Named Funds that are relevant to this action were substantively identical.

Revenue] Code."  Each LLC Agreement also provided that "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets," AllianzGI "shall at all times use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA."

23.     The PPM for each Alpha Fund also established AllianzGI as a fiduciary, as the term is defined by ERISA, "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA."  The PPMs further provided that ERISA's standard of care would apply even if a particular Alpha Fund's assets were not "Plan Assets" as defined under ERISA:

> During any such time that the assets of the Fund are not treated as "plan assets" for purposes of ERISA and Section 4975 of the [Internal Revenue] Code, [AllianzGI] nevertheless will use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA. Under that standard, [AllianzGI] will be required to exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

24.     As set forth in the Named Funds' respective PPMs: (i) the US Equity 500 Fund's stated objective was to outperform the S&P 500 Index by 5% per year, net of fees and expenses; and (ii) the 1000 and 1000 Plus Funds' stated objectives were to outperform the 3-Month Treasury Bill Index by 10% each year, net of fees and expenses.[3]

25.     As the Alpha Funds' Managing Member, AllianzGI represented in the PPM and its other marketing materials that it would seek to accomplish these performance goals by engaging

---

[3]     As for the other Alpha Funds, their stated targeted returns (net of fees and expenses) were as follows: (i) the objective of the Structured Alpha US Equity 250 Fund (the "US Equity 250 Fund") was to outperform the S&P 500 Index by 2.5% per year; (ii) the objective of the Structured Alpha Global Equity 350 Fund (the "Global Equity 350 Fund") was to outperform the Morgan Stanley Capital International All Country World Index Investible Market Index ("MSCI ACWI IMI") by 5% per year; (iii) the objective of the Structured Alpha Global Equity 500 Fund (the "Global Equity 500 Fund") was to outperform the MSCI ACWI IMI by 5% per year; (iv) the objective of the Structured Alpha US Fixed Income 125 Fund (the "US Fixed Income 125 Fund") was to outperform the Barclays Capital U.S. Aggregate Bond Index ("BC US Agg") by 1.25% per year; (v) the objective of the Structured Alpha US Fixed Income 250 Fund (the "US Fixed Income 250 Fund") was to outperform the BC US Agg by 2.5% per year; and (vi) the objective of the Structured Alpha 500 Fund (the "500 Fund") was to outperform the 3-Month Treasury Bill Index by 5% per year.

in a two-pronged investment strategy that would include two basic components: a "beta" component and an "alpha" component.

### A.     The Beta Component of AllianzGI's Investment Strategy

26.     The "beta" component of the US Equity 500 Fund (as well as the US Equity 250 Fund) consisted of investments in the S&P 500 via futures contracts on the S&P 500.  In general, a futures contract **requires** the buyer of the contract to purchase (i) a specified asset (and **requires** the seller to sell that asset), (ii) on a specified, predetermined future date, (iii) at a specified predetermined price.  S&P 500 futures contracts, which track the prices of the stocks that make up the S&P 500 Index, are some of the most liquid and most traded futures products in the world, with approximately 1.5 to 2.0 million contracts (with a notional value of over $250 billion) trading per day.  S&P 500 futures differ from the above general description because they are cash-settled (as opposed to futures in certain commodities, like oil, which are contracts for physical delivery).[4] S&P 500 futures are listed on the Chicago Mercantile Exchange ("CME") and also trade on virtually a 24-hour basis on the CME Globex exchange from Sunday afternoon through Friday afternoon (Chicago time).  According to the CME's website, the CME's "E-mini S&P 500 futures contract" (ticker symbol "ES") is "one of the most liquid futures contracts in the world and one of the most efficient and cost-effective ways to gain market exposure to the S&P 500 index."[5]

---

[4]     Industry participants created the cash-settlement mechanism to resolve the logistical challenges that would be presented by requiring a contracting party to actually deliver shares of the 500 stocks associated with a S&P 500 futures contract.  Not only would the shares have to be negotiated and transferred between holders, but they would have to be properly weighted to match their representation in the S&P 500 Index.  Instead, an investor in S&P 500 futures effectively takes a long or short position, which can then be readily and continuously valued based on the prices of the component stocks in the S&P 500 Index.  Eventually, the contract expires, or is offset, and becomes cash-settled based on the spot value of the S&P 500 Index.  S&P 500 futures expire quarterly, on the last trading day of the months of March, June, September, and December.

[5]     The "e-mini" S&P 500 futures contract is one-fifth the size (and hence one-fifth the cost) of the so-called "big contract."  Although the "big contract" was for many years the standard size for an S&P 500 futures contract, today the "e-mini S&P 500 futures contract" is now the most widely traded size, even among most institutional traders.

27.     In similar fashion, though using somewhat less liquid derivatives, the Global Equity 350, Global Equity 500, US Fixed Income 125, and US Fixed Income 250 Funds gained "beta" exposure to the relevant benchmark indices for those Funds.

28.     As for the 1000 Fund (as well as the 500 and 1000 Plus Funds), its "beta" component consistent of direct investments in three-month U.S. Treasury bills (*i.e.*, Treasury bills with three-month maturity windows) whose yields were equivalent to the 3-Month Treasury Bill Index.  U.S. Treasury bills are short-term obligations backed by the full faith and credit of the United States and are the highest-rated government debt securities in the world.  Treasury bills are among the most liquid and widely traded financial products in the world and are considered by financial markets to be effectively free of credit risk.  Indeed, for purposes of posting collateral and related collateral-management purposes, short-maturity U.S Treasury bills are invariably treated by market participants as the equivalent of cash.

29.     In the Named Funds' respective PPMs, AllianzGI stated that the Named Funds would not "borrow money to make investments," but that each would "engage in operational leverage by using the underlying investments of [its] Beta Component as collateral in pursuit of [its] Alpha Component."  On information and belief, the PPMs for the other Alpha Funds contained substantively identical representations.

30.     In connection with the US Equity 250 and US Equity 500 Funds, AllianzGI obtained operational leverage by first allocating a portion of the relevant Fund's assets to the purchase of S&P 500 futures.  Those positions formed the basis of each Fund's "beta" component, but were purchased "on margin" – that is, in exchange for a fraction (or "margin") of the total contract value.  This approach of buying S&P 500 futures on margin (i) allowed the US Equity 250 and US Equity 500 Funds to effectively acquire a core "beta component" that would track the

performance of the index, while also (ii) leaving a large amount of additional investor capital that AllianzGI could then trade option contracts to fund the strategy's "alpha" component (*see* §I.B. below).  At the same time, by buying a portfolio of S&P futures that was heavily financed on margin, these Funds could achieve far greater "long" exposure to the S&P 500 Index (for better or worse) than they could have achieved if they had simply bought, for example, non-leveraged mutual fund shares or ETF shares that replicate the performance of the S&P 500 Index.

31.    AllianzGI used substantively the same techniques (but using derivatives geared to their respective indices) to obtain operational leverage for the Global Equity 350, Global Equity 500, US Fixed Income 125, and US Fixed Income 250 Funds.

32.    Similarly, in connection with the 500, 1000, and 1000 Plus Funds, AllianzGI achieved operational leverage by first allocating a portion of those Funds' assets to the purchase of U.S. Treasury bills.  Those positions formed the basis of each of these respective Funds' "beta" components.  AllianzGI then caused these Funds to pledge their respective T-bill holdings as collateral to finance their respective trades of option contracts, which comprised the Funds' "alpha" components (*see* §I.B. below).

33.    In sum, although not every Alpha Funds had the same "beta component," as discussed below each Fund relied on the same fundamental "Structured Alpha" investment strategy to generate "alpha" returns that would exceed the performance of their respective benchmarks.

**B.    The Alpha Component of AllianzGI's Investment Strategy**

34.    Turning next to the "alpha" component of AllianzGI's investment strategy for the Alpha Funds, AllianzGI represented in its PPMs and marketing materials that the Named Funds would generate profits from making "investments in puts and calls on equity indices," which would be structured to "create option-based profit zones."  On information and belief, AllianzGI also

made substantively identical representations in its PPMs and marketing materials for the other Alpha Funds.

35.     "Puts" and "calls" are types of option contracts (or "options"), which are contracts that give the purchaser of the option the right (but not the obligation) to buy or sell an underlying asset, at a fixed price, on or before a specified future date.  Options (like futures) are a basic species of "derivatives" – financial instruments that derive their value from their underlying assets.  The underlying assets can include, among other things, stocks, exchange-traded funds, fixed-income products, foreign currencies, or commodities – or, as here, the value represented by a major stock index, such as the S&P 500 Index.

36.     In exchange for an upfront cash payment (referred to as a "premium"), the purchaser of a put or call option buys the *right* to buy (in the case of a call) or to sell (in the case of a put) an instrument during a specified time period at a *fixed* "strike price," regardless of the extent to which the price of the underlying security (or index) rises or falls during the term of the contract.  Conversely, the seller (or "writer") of an option contract receives an upfront, irrevocable cash premium payment, but has an *obligation* to sell (in the case of a call) or to buy (in the case of a put) the security (or, in effect, the securities represented by an index) at the strike price if requested to do so by the seller's counterparty at any point during the term of the contract.

37.     At the expiration of an option contract, the contract is said to be either "in the money" or "out of the money," which refers to the relationship between the pre-established strike price of the option contract and the actual price of the underlying security (or index) on a particular date.  The terms "in the money" and "out of the money" have different meanings depending on whether the option is a call or a put.  A call option is "in the money" whenever the strike price is less than the current market price for the underlying security (or index), whereas a put option is

"in the money" if the strike price is greater than the current market price for the security (or index). Conversely, a call option is "out of the money" whenever the strike price is greater than the current market price for the underlying security (or index), whereas a put option is "out of the money" whenever the strike price is less than the current market price for the underlying security (or index).

38.     In practical terms, whether an option is "in the money" or "out of the money" determines what will happen to the contract at its expiration.  If, for example, a call option expires "in the money" (*i.e.*, its strike price is less than the actual market price for the security or index at the expiry date), it would be profitable for the purchaser of the call to exercise his or her option to purchase the security at the strike price, rather than at the current (and higher) market price.  If the same call option expires "out of the money," however (*i.e.*, its strike price is greater than the market price at expiry), it would make little financial sense for the purchaser of the call to exercise its option to purchase at the strike price because the purchaser could instead simply buy the underlying instrument (or index) at the then-current (and lower) market price on the open market.  In such a case, the option contract will expire worthless.

39.     Like the market for S&P 500 futures described above, the market for S&P 500 options contracts is one of the most liquid and most traded markets in the world.  And as with futures contracts, the value of any given option on the futures (or portfolio of such options) can be readily calculated using widely available pricing algorithms based on: (i) the ***current*** market value of the underlying index; (ii) the amount of time remaining before the option's expiration date; and (iii) prevailing market volatility levels.  The value of any given option (or portfolio of options) as of any particular date in the future can also be readily and accurately calculated based on whatever

combination of index values and volatility values that a fund manager chooses to model.[6] Similarly, the markets for other types of options contracts that the Alpha Funds, including the Named Funds, invested in, such as options on the VIX index, are highly liquid, readily valued (based on the same combination of current market of the underlying index, the time left before the options expiry, and prevailing market volatility levels), and "priceable" as of any particular future date based on whatever combination of index and volatility values that one chooses to model.

40.     As noted above, application of AllianzGI's investment strategy with respect to the "alpha component" of the Alpha Funds' investments involved causing the Alpha Funds, directly or indirectly, to enter into various options contracts.[7]

41.     To a significant extent, this component of AllianzGI's strategy involved selling (a/k/a "writing") so-called "short options" that AllianzGI expected would expire "out of the money" and that would, therefore, not be exercised by the entities that purchased those options from one of the Alpha Funds.[8]  To illustrate how this worked, one can consider an example based on the buying and selling of S&P 500-based put and call option contracts.  For illustrative purposes, if the S&P 500 Index were trading at 2500, as part of its alpha strategy, an Alpha Fund might write S&P 500 call options with a strike price of, say, 2750 – which would represent a bet by that Alpha

---

[6]     Certain other factors (such as the S&P dividend rate and the prevailing risk-free rate of return) can also impact the value of S&P options at the margins, but their impact is not material to the allegations set forth herein.

[7]     Certain communications from AllianzGI to Alpha Fund investors describe how the individual Alpha Funds (plural) were part of the AllianzGI "Structured Alpha Portfolio" (singular), and AllianzGI issued common communications to all Alpha Fund investors that referred to AllianzGI's efforts to manage "the Portfolio" (singular) "to *its* alpha targets and in accordance with *its* design."  Such references indicate that although the Alpha Funds differed in terms of the investments that comprised their "beta components," the "alpha component" of each Alpha Fund (including the Named Funds) may have involved investing in a commonly managed alpha "investment pool."

[8]     As noted above, it remains unclear to what extent the alpha component of each Alpha Fund (including the Named Funds) was purchased and managed on a fund-by-fund basis, or whether AllianzGI managed a common alpha pool (or pools) of investments on behalf of all (or groups of) Alpha Funds that made up AllianzGI's "Alpha Portfolio" (singular) – with each Alpha Fund (or each group of Alpha Funds that shared a common "alpha" performance goal, such as each "1000" fund) receiving an allocation of a commonly managed alpha "pool."  For ease of reference, however, the discussion below describes the common principles underlying each Alpha Fund's "alpha" investments as if it were done on a fund-by-fund basis.

Fund that the S&P 500 would close under 2750 at the option's maturity date.  In that expected scenario, the Alpha Fund would (i) pocket the value of the premium (*i.e.*, the upfront payment) it received from the buyer who had purchased the contract from the Alpha Fund; and (ii) have no liability to the buyer resulting from market changes, as in this scenario the call option would expire "out of the money."  The same scenario would operate in reverse for sales of puts with a strike price of 2250 – in other words, in the expected scenario in which the S&P 500 Index did not decline to 2250, the Alpha Fund would again (i) pocket the upfront premium; and (ii) have no liability to the buyer, as the put option would also expire "out of the money" in this scenario.

42.     In the above scenario, the use of short options can be said to create a "profit zone," whereby the strategy yields a positive "alpha" return as long as the closing value of the S&P 500 is between 2250 and 2750 at the option's maturity date.  AllianzGI referred to this aspect of its "alpha" investment strategy as its "Range-Bound Spreads" strategy.

43.     As the above example illustrates, it is a fairly simple process to design a "short options-only" (or "Range-Bound Spreads") portion of an investment portfolio that (for each option sold) will generate a fixed premium upfront and that is guaranteed to yield a net positive return (derived solely from the premiums received upfront), ***provided*** that the market price of the underlying instrument is confined to within (or nearly within) the high and low levels represented by the strike prices on the short calls and short puts, respectively, in the portfolio (*e.g.*, in our example, as long as the S&P 500 Index traded within a "profit zone" of no lower than roughly 2250 and no higher than roughly 2750).[9]

---

[9]     A "short option" position that is only marginally "in the money" (from the perspective of the buyer) may still be marginally profitable to the seller because the loss resulting to the seller from the option being "in the money" may be less than the upfront premium that it received when it sold the option to the buyer.

44.    Indeed, the current value of any given options contract (with its predetermined expiration date) can be readily and accurately calculated using widely available (and fundamentally common) pricing algorithms based on three basic factors: (i) the **current** market value of the underlying index (*e.g*., the S&P 500 or the VIX); (ii) the amount of time remaining before the expiration date of the option (since a contract set to expire tomorrow is far less likely to change in value before the expiry date than a contract that still has 10 weeks to run before expiration); and (iii) the prevailing implied volatility level in the market (as measured by, for example, a volatility index, such as the "VIX").[10]  Similarly, one can calculate what the value of the contract will be at any given point in the future under basically any conceivable market and volatility assumption by simply plugging in whatever assumed values for such variables that is plugged into any of the widely used options pricing algorithms (such as those available through Bloomberg terminals).  And similarly, a fund manager can readily generate graphs showing, with exceptionally high accuracy and reliability, how any given options contract – and how any given **portfolio** of options contracts – will perform over time if one assumes rising or falling values of the relevant index (e.g. the S&P 500 Index), or rising or falling levels of implied volatility.

45.    As noted above, the same principles and considerations discussed above that are applicable to the trading of S&P 500 Index options are equally applicable to the trading of the other types of options contract that the Alpha Funds (including the Named Funds) invested in, including VIX options (where the underlying index is the VIX rather than an equity index).

46.    AllianzGI described the net premiums that each Alpha Fund derived from transacting in options as providing that Alpha Fund's "alpha" returns.  Significantly, however, the

---

[10]    When markets are experiencing relatively high levels of volatility, the probability of the current value of a given options contract becoming materially higher (or lower) before the contract's expiration date is higher than would be the case if markets were experiencing relatively low levels of volatility.

amount of premium that can be collected on the selling of options is inversely related to the size of the difference between the strike price and the current market price at the time the option is sold. This is because an investor will be willing to pay much more for "nearer-to-the-money" options that, *e.g.*, will be "in the money" if the market moves only 50 points in its favor, as compared to an option that will only be "in the money" if the market moves, say, 250 points in its favor.

47.     These options transactions could be (and were) funded "on margin," which would further increase the Alpha Fund's operational leverage.  Indeed, operating on leverage was, as a practical matter, an essential (if inadequately described) component of the Alpha Funds' short options-based (a/k/a Range-Bound Spreads) "alpha" strategy because the only way AllianzGI could hope to have its Alpha Funds (including the Named Funds) regularly meet their targeted annual returns would be to: (i) harness the relatively small premiums it received from selling options that it expected to expire "out of the money"; and (ii) *multiply* those expected returns many times over through the power of leverage.

48.     In addition to selling a combination of "short calls" and "short puts" to create a basic profit zone, as described above, each Alpha Fund's investment strategy also involved employing combinations of short options and "long options" – as part of what AllianzGI called a "Directional Spreads" strategy – that would generate favorable returns even if the performance of the S&P 500 (or other applicable index, such as the VIX) were sufficiently volatile that it fell outside the core profit zone established pursuant to the "Range-Bound Spread" (or "short options-only") component of its "alpha" portfolio.  Creating such "extended" profit zones can be viewed as creating a hedge against underperformance of the "short options" that defined the profitability limits of the "profit zone" created by the "Range-Bound Spread" portion of the Alpha Fund's portfolio.  For example, by pairing (i) the *sale* of additional calls (resulting in "short call" positions)

that have, *e.g.*, a strike price of 3000 (which is not expected to be reached) with (ii) the ***purchase*** of calls (resulting in "long call" positions) that have, *e.g.*, a strike price of 2750, each Alpha Fund could create an additional "profit zone" (or what might be called an "upside extended profit zone") where the combination of these positions would be profitable as long as the market traded between roughly 2750 and 3000.  Conversely, by utilizing combinations of short puts and "long puts" with strike prices of 2000 and 2250, respectively, one can lock in profits as long as the market traded between roughly 2000 and 2250 (in what might be called a "downside extended profit zone").[11]

49.     To put it another way, AllianzGI described the benefits of the "Directional Spread" component of its strategy as allowing the Alpha Funds to "benefit from a large index move to the upside and/or downside," with the resulting options positions "act[ing] as portfolio diversifiers, with the ability to add incremental gains when markets behave less typically."  AllianzGI also represented that, historically, the core "Range-Bound Spread" component of each Alpha Fund's portfolio contributed roughly two-thirds of each respective Alpha Funds' "alpha," and that the "Directional Spread" component contributed the remaining one-third.

**C.     The Alpha Funds' "Long Put" Hedges Against More Extreme Market Declines – and the Need for Active Management to Protect Fund Investors' Capital in Scenarios Where the Market Begins to Materially Move Against Their Overall Market Positions**

50.     Finally, to protect against the most extreme declines in the value of the S&P 500 (or other underlying index, such as the VIX) and related adverse market volatility, AllianzGI represented that it would cause the Alpha Funds (including the Named Funds) to acquire hedging positions in the form of long puts.  AllianzGI materials referred to this third leg of its "alpha" strategy as its "Hedging Positions" component, which it described as being "designed to protect

---

[11]     The concept of core and extended "upside" and "downside" profit zones was reflected in Allianz's own materials.  *See, e.g.*, materials reproduced at ¶¶65, 77, and 79 below.

the portfolio in the event of a market crash." Such long puts would have strike prices that would only be "in the money" (from the perspective of the Alpha Funds as the buyers of the puts) if the market fell below the bottom limit of its "downside extended profit zone." For example, to continue with our example above using S&P 500-based options, the Alpha Funds – while the market was still at 2500 – might prudently purchase long puts with strike prices below 2000 to provide a hedge that would protect against a 20% or greater market decline – *i.e.*, they would buy puts that would become more valuable (and eventually be "in the money") if and as the market index fell closer to (or below) 2000.

51.     Due to the exceptional transparency and efficiency of the markets for S&P 500 futures and options contracts – and the reliability of the common and nearly identical algorithms that are used by market participants (such as the common Black-Scholes pricing models and related algorithms that are programmed into every standard options calculator, and which are readily available and used as a matter of course by every professional trader and broker in the world) to value any given options or future contract under virtually any conceivable combination of assumed index and volatility values as of any selected date – it is effectively just a matter of non-negligent application of basic futures and options concepts to construct a leveraged S&P 500 Index-based futures and options portfolio that is effectively guaranteed to provide positive returns, as long as the S&P 500 trades within certain predefined ranges. Indeed, as further discussed below, given the power of computers, one can also readily determine with an extremely high degree of accuracy what the investment performance of such a portfolio will be at any given point in time in the future based on two primary inputs, namely: (i) the assumed value of the S&P 500 Index on such future date; and (ii) the assumed level of prevailing implied volatility on such date (which is most commonly measured using what is known as the "VIX Index"). Because this type of hedging

involves ***buying*** (rather than selling) puts that are expected to expire well "out of the money" (*i.e.*, be worthless at expiry), a buyer (such as the Alpha Funds) expects to lose all the money it has to pay out as premiums to buy such positions.  Purchases of such hedges would therefore necessarily reduce the Alpha Funds' overall investment performance in all but the most extreme market downturns, but can be viewed as a form of insurance against sharp market declines.

52.     The principles and considerations referenced in the immediately preceding paragraph also apply to trading in the kinds of other instruments that the Alpha Funds invested in, including, *e.g.*, VIX options contracts.

53.     Unfortunately for investors generally, just as there are no "free lunches" in life, there is no investment strategy (whether options-based or otherwise) that can guarantee risk-free profitability in ***every*** conceivable scenario.  Thus, the price of striving for returns that are consistently (and materially) greater than the return of a benchmark, such as the S&P 500, is that the risk of incurring large losses will increase sharply as the market moves increasingly towards (and past) the extremities of the overall "profit zones" that the portfolio was originally built around. In such scenarios, a fund manager that implemented the type of relatively plain vanilla "beta" and options-based "alpha" strategies on which the Alpha Funds relied, and that (as here) had also represented to its investors that it could achieve consistently high returns while simultaneously protecting investors' capital from large losses, invariably has two fundamentally different choices.

54.     First, as the market moves increasingly away from the "center point" around which the alpha portfolio is balanced – and into increasingly more risky extremes of lower values and greater volatility – the fund manager can reduce risk (including the risk of catastrophic loss) by (i) reducing leverage; (ii) buying additional hedges (such as long puts); and (iii) otherwise effectively "rebalancing" the portfolio so that its center point is "re-centered" in response to the

falling market.[12]  However, the cost of reducing risk will, at a certain point, come at the cost of having to accept materially lower investment returns, whether as a result of reducing leverage or by having to pay costs associated with rebalancing the portfolio.  Significantly, a fund manager's delay in implementing risk mitigation steps can also result in a fund having to pay much higher prices for, *e.g.*, its failsafe hedging positions (consisting of long puts with low strike prices) than would have been the case had the manager acted earlier.  For example, a long S&P put that could be purchased for a given amount based on current market conditions with a strike price 12% below the current value of the S&P 500 can be expected to at least ***quadruple*** in price (*i.e.*, to increase by roughly a factor of four or more) if, during the following hours, days, or weeks, the S&P 500 were to decline by roughly 5% and the VIX (volatility) were to increase by roughly 15 points.[13] This type of scenario is one that would be part of any reasonably competent and prudent fund manager's daily risk-management framework and stress testing.

55.    Second, as the market moves increasingly away from this type of fund's center-point and becomes more volatile, instead of acting to reduce the fund's growing risk a fund manager may instead choose to effectively "stay the course" – by doing nothing or by engaging in only nominal or otherwise wholly inadequate hedging or re-balancing efforts – in the ***hope*** that the market will reverse course and return the fund to the middle of its original "profit zones" (where the fund will both outperform its benchmark index and also return to a low risk state).  But a fund

---

[12]    For illustrative purposes, one might consider the following example to show the concept of rebalancing. Assume a portfolio that was originally structured to create core ("Range-Bound") and extended ("Directional Spread") profit zones that were centered (or "balanced") around an S&P 500 Index value of 2500.  If the market thereafter trades down over a given period to only 2200, a prudent fund manager will reposition the portfolio's option positions and resulting "profit zones" accordingly over the same period to re-balance them around a new "center point" of 2200.

[13]    For example, a short put option on a S&P 500 futures contract expiring on September 18, 2020, with a strike price set at 2850 (equal to 12% less than the-then current S&P 500 level), would have cost roughly $1,225 if purchased on July 29, 2020.  However, if one were to assume that the next day the S&P 500 experienced a one-day decline of just 5%, and that VIX volatility increased by 15 points, the same option (2850 strike price and expiring on September 18, 2020) would cost $5,415 – ***or 442% more***.

manager that relies on such hopes (rather than actively reducing portfolio risk) runs an increasingly foreseeable and reckless risk of financial catastrophe for their investors.

### D.    The Moral Hazard Incentives Built into the Alpha Funds' Fee Structure

56.    As described in the Offering Documents, the fees payable by investors (a/k/a "Members") in the Alpha Funds (including the Named Funds) to AllianzGI for managing the Alpha Funds provided for an "incentive allocation" to be paid to AllianzGI each quarter from the Alpha Funds' assets.  Specifically, as described in the PPM, AllianzGI was entitled to receive, at the end of each calendar quarter, "30% of the excess of the Net Capital Appreciation . . . allocated to the Capital Account of [each] Member for such calendar quarter over the amount which such Member's Capital Account would have earned had it generated a return equal to the [benchmark index] for such calendar quarter."  In other words, each Alpha Fund investor was in essence required to pay AllianzGI 30% of the amount by which the returns on the "alpha" portion of that Alpha Fund's portfolio generated returns in excess of the returns on the "beta" portion of the portfolio.

57.    Significantly, the Alpha Funds' management fee structure also included what AllianzGI referred to as a "cumulative high water mark" feature.  Whereas the 30% of "excess returns" feature would result in AllianzGI being rewarding for successful investment performance, the "high water mark" feature was effectively structured to impose an offsetting penalty for poor performance.  Specifically, the "high water mark" feature was structured so that "the Net Capital Appreciation upon which the calculation of the Incentive Allocation [on an investor's account] is based" would be ***reduced*** in proportion to the aggregate amount (if any) by which the returns on the investor's account had previously underperformed the performance of the relevant Alpha Fund's benchmark index.  In other words, if the account of a given investor were to underperform compared to the relevant benchmark index, that investor would not owe ***any*** fees to AllianzGI

unless and until the market value of that investor's account balance returned to (and increased above) its previous "high water mark."

58.     Notably, the "incentive allocation" fee was the ***only*** fee that AllianzGI collected from Alpha Fund investors.  Unlike the standard "two and twenty" fee structure employed by typical hedge funds, in which the fund manager collects both a management fee (calculated as a percentage of the fund's total assets under management) and a separate performance fee that is a percentage of the fund's profits, AllianzGI did ***not*** collect a management fee.  This meant that if an investor's account were to dip significantly below its previous "high water mark," AllianzGI faced the prospect of months or years without collecting ***any*** fee for its management services from that investor.  Part of what allowed AllianzGI to implement this type of fee structure was the fact that AllianzGI was part of Allianz Global Investors – the Allianz Group's global asset management business – which gave AllianzGI the benefit of economies of scale, as well as the purported advantages of centralized risk-management and oversight functions.

59.     Although this "high water mark" feature was structured in a way that arguably incentivized AllianzGI to generally avoid scenarios where investors' accounts were exposed to meaningful risks of significant loss, the feature also could create increasingly serious and dangerous "moral hazard" problems in situations where AllianzGI failed to adequately manage the Alpha Funds' risk (either though inaction or undue delay).  More specifically, if AllianzGI failed to prudently and timely "rebalance" the Alpha Funds' alpha exposure (and/or to otherwise reduce risk by reducing leverage and buying more long puts) in response to index price movements towards the lower extremities of the Alpha Funds' existing "profit zones" – and in response to any related increases in directionally negative market volatility – then the costs of belatedly reducing portfolio risk would increase sharply (and would continue to increase as long as market trends

continued to move against what would, in effect, be an increasingly "unbalanced" portfolio).  And at a certain point, the costs of belated hedging might become so great that, instead, a fund manager might well rationally conclude that it was in the ***manager's*** best financial interests to simply hope for the markets to "revert to the mean" rather than to lock in substantial losses (due to the high costs of belatedly implementing risk reduction measures).  Although even belated (and costly) implementation of risk reduction measures would likely continue to be in the best interests of an Alpha Fund's ***investors*** in such a scenario, any catastrophic portfolio losses that would be suffered if markets did ***not*** "revert to the mean" would still be overwhelmingly born by that Alpha Fund's investors ***and not by the Alpha Fund's managers***.  Accordingly, rather than lock-in, say, a 20% portfolio loss in connection with belated efforts to reduce risk – which might put the fund manager "in a hole" that would take it years to get out of under the applicable "high water mark" provisions – a self-interested manager might well be motivated to simply hope for a favorable change in the market even if it risked ***catastrophic*** losses for an Alpha Fund's investors (because the manager, in the event of a portfolio meltdown, would not lose its own money, and could seek to simply shut down the fund and/or start afresh with a new fund that would not come with the overhang of substantially "sub-high water mark" market value).

## II.   AllianzGI's False and Misleading Statements Concerning the Alpha Funds' Risk Controls

60.     In 2018, AllianzGI prepared a series of slide presentations (the "2018 Investor Presentations") for Plaintiffs and other investors in the Named Funds (and, on information and belief, for investors in the other Alpha Funds), in which AllianzGI made substantially identical false and misleading representations to its investors regarding these Alpha Funds' risk characteristics and risk controls.

61.     Among other things, AllianzGI claimed in the 2018 Investor Presentations that the Alpha Funds, including the Named Funds, were "designed to outperform whether equity markets are up or down, smooth or volatile," citing their "three-pronged investment objective" of: (i) "outperform[ing] during normal (up/down/flat) market conditions"; (ii) "***protect[ing] against a market crash***"; and (iii) "navigat[ing] as wide a range of equity-market scenarios as possible."

62.     With respect to avoiding risk – including the risks associated with making "bets" on the "direction" of either the market or volatility – the 2018 Investor Presentations further represented that the Alpha Funds' managers (which in each case was AllianzGI) would:

- "pursue outperformance, but [] not presume that the market will behave normally or that history will repeat itself";

- "***never make a forecast on the direction of equities or volatility***";

- "always be a net buyer of put options, ***providing protection against a tail event or market crash***"; and

- "prepare for the unexpected" and "pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses."

63.     AllianzGI further represented that it would achieve these goals by relying on the investments strategies discussed earlier, which AllianzGI described as being based on the following:

(a)     "Range-bound" spreads, which involved collecting upfront premiums on sales of "short call" options that were expected to expire worthless, as long as the S&P 500 traded within a particular range (thereby allowing the Alpha Fund to retain all of the upfront premiums, without any offsetting losses that would be incurred if the S&P 500 Index traded ***outside*** that range);

(b)     "Directional spreads," which involved investing in a combination of short and long put and call options and which would also be profitable on a net basis, as long as

the S&P 500 traded within certain ranges that effectively created additional, extended "profit zones"; and

(c)     "Hedging Positions," which involved buying long put options that operated primarily as insurance.  As previously discussed, these long put options were expected to expire "out of the money," which would mean that the premiums paid to buy them would not be recouped – but if they expired "in the money," the resulting profits could be used to offset the losses that would be incurred by the "range-bound" and "directional spread" components of the portfolio in the event that the market suffered (in AllianzGI's words) a "short-term equity-market crash."

64.     With respect to its relative positioning in "long puts" vs. "short puts," AllianzGI also specifically represented in its 2018 Investor Presentations that the Named Funds would hold "approximately 30% to 50% more long puts than short at all times" – in other words, that the funds would always be "net long [in] options," giving investors comfort that the funds would be protected from (and might even profit from) a significant market move to the downside.  AllianzGI also represented that it maintained a "laddered" portfolio of long puts as part of its "Hedging Positions" strategy with strike prices ranging from -10% to -25% at acquisition (*i.e.*, long puts that would be "in the money" if the S&P 500 *fell* 10% to 25% compared to the S&P 500's level when they acquired such puts) and that, as market volatility rose, AllianzGI would increase the amount the Named Funds would spend on hedging strategies (*i.e.*, increase the relative size of their "long put" positions).

65.     AllianzGI illustrated these three methods in the context of investing in S&P 500 options using the following diagrams[14]:

---

[14]     The diagrams reproduced below are from an illustrative US Equity 500 Fund presentation prepared by AllianzGI.  AllianzGI prepared and distributed substantively identical diagrams that it used in other Fund presentations



66.     Taken together, these three diagrams effectively represented that the "alpha" component of the Alpha Funds, including the Named Funds, could, and would, be consistently managed to operate in a "profit zone" regardless of whether the S&P 500 (or other index) went up, down, or stayed the same (except in circumstances where, *e.g.*, the S&P 500 or other market index increased in value dramatically, in which case the Alpha Funds' investors would presumably not be unduly concerned because the Alpha Funds' investors would presumably be reaping large returns from the bulk of their non-Fund investments).

67.     AllianzGI also represented in its 2018 Investor Presentations that it subjected its Alpha Funds to a three-pronged "risk management" regimen that included "scenario analysis," "portfolio monitoring," and "stress testing."   In a due-diligence questionnaire distributed to potential investors in September 2017 (the "2017 Due Diligence Materials"), AllianzGI further

---

(including 1000 Fund presentations), although the illustrative levels used in such presentations appear to have varied depending on the date they were prepared.  On information and belief, AllianzGI used substantively identical diagrams to describe its alpha investing strategies for the other Alpha Funds.

represented that the Alpha Funds' risk controls involved conducting "31 stress tests" and performing "an extensive set of scenario analyses to ensure that all portfolios' style and construction are within guidelines."

68.     AllianzGI further represented in the 2017 Due Diligence Materials that AllianzGI's "Performance and Portfolio Risk function monitors daily trade activity and weekly risk profiles to check for any significant shifts" in the Alpha Funds' portfolios.  To do this, AllianzGI represented that it was supported by an "independent service provider," IDS GmbH-Analysis and Reporting Services, which was a wholly owned subsidiary of Allianz SE that AllianzGI represented would provide the Alpha Funds with a "comprehensive range of on-going and consistent performance and risk analysis reports."

69.     In addition, in its Client Commentary for the third quarter of 2018 that was provided to each investor in at least the Named Funds, AllianzGI further represented that it would "always prioritize preserving [the Named Funds'] risk profile," *even at the risk of limiting the Named Funds' profitability*, stating:

> When volatility is low, [the Named Funds'] expected outperformance[15] would typically be limited to its targeted rate, but not greater. *This is because we <u>always</u> prioritize preserving our risk profile*. Even if outperformance is behind schedule for the year, as is the case in 2018, we still will not reach for a faster recovery by tightening our range-bound profit zones to collect more option premium. *To take on greater risk in a low-volatility environment would be short-sighted and imprudent*.

70.     As set forth below, however, AllianzGI's representations concerning its purported approach were materially false and misleading.  In particular, to the extent that AllianzGI actually performed conducting stress tests (let alone 31 different stress tests) and other "scenario analyses to ensure that all portfolios' style and construction [were] within guidelines," AllianzGI failed to

---

[15]     Or, as stated in the 1000 Fund commentary, "excess return."

disclose that it deliberately, or recklessly (or at least negligently), ignored and/or failed to prudently respond to warning flags that even the most basic and elementary of risk-management testing identified, and/or that it lacked reasonably adequate risk-management controls to avoid a meltdown in the value of the Alpha Funds' portfolios.  In addition, as further described below – and contrary to its assurances that it would "always prioritize preserving our risk profile" – since at least 2017, AllianzGI had increased (and would continue to substantially increase) the Alpha Funds' leverage to "chase" higher alpha returns at the expense of proper risk controls.  AllianzGI's increasingly reckless pursuit of higher alpha returns had the entirely predictable effect of increasing (and was motivated primarily by AllianzGI's desire to increase) the amount of "incentive allocation" fees that AllianzGI could collect from the Alpha Funds' investors – but also had the equally predictable effect of increasing the Alpha Funds' exposure to sharp markets declines (other than declines that quickly reversed course).

71.    Unfortunately for investors, however, AllianzGI's imprudent and reckless (or at least negligent) pursuit of higher alpha returns also had the equally predictable and foreseeable effect of exposing the Alpha Funds' investors to catastrophic losses in the event that markets did not cooperate, as further discussed below.

72.    In contrast to the Offering Documents' statements concerning the Named Funds' use of "operational leverage," AllianzGI also misleadingly represented in the 2018 Investor Presentations that these Funds would engage in "no borrowing" – while conspicuously failing to explain or disclose how AllianzGI's options-trading strategy *relied* on purchasing futures and options contracts on margin, which greatly increased the Named Funds' leverage and risk exposure.

III.    **AllianzGI Begins to Increase Risk by Increasing the Alpha Funds' Leverage and "Tightening the Spreads"**

73.    As previously discussed, one of the two critical variable inputs in determining the value of an option at any given point in time is *volatility*, or the level of fluctuation in the market price of the underlying asset.[16]  As an asset's volatility drops, so does the price at which an "out of the money" option based on that asset can be sold.[17]  The current price of an S&P 500-based option contract will reflect the then-current level of volatility (which is widely measured using the VIX Index), and the same option's price as of any future date can be reliably calculated based on whatever different volatility (and S&P 500 Index) values are input for that date.

74.    Throughout 2017 and the first three quarters of 2018 (with the notable exception described immediately below), the level of volatility in the stock market, as measured by the VIX, was at historically low levels.

75.    As this low-volatility environment continued throughout 2017 and 2018, the prices that the Alpha Funds, including the Named Funds, received for their sales of options dropped, thus reducing the incremental "alpha return" that each sale could generate.

76.    In order to meet (if not exceed) each respective Alpha Fund's investment goals – and to maximize AllianzGI's lucrative 30%-of-the-profits "incentive allocation" fees based on *AllianzGI's* assessment of risks vs. rewards as they impacted *AllianzGI's* financial interests (rather than the interests of the Alpha Funds' investors) – AllianzGI needed to find an additional source of alpha returns.

---

[16]    The other key variable input in pricing a given S&P 500 Index option is the price of the underlying index. The other two most important pricing inputs are the strike price and the unexpired length of the option term, but those inputs are fixed (rather than variable) in any given option transaction.

[17]    Conceptually, this is primarily because it becomes less likely that an "out of the money" option will expire "in the money" as markets become increasingly tranquil.  Conversely, increasing volatility makes such an option more valuable, as increased volatility makes it *more* likely that such an option will expire "in the money."

77.     As Plaintiff's consulting experts have concluded, during 2017 and 2018, AllianzGI caused the Alpha Funds, including the Named Funds, to achieve these additional alpha returns by causing the Alpha Funds to engage in either or both of the following practices:

(a)     Selling the same option contacts (*i.e.*, options with the same terms and strike prices that the Alpha Funds would otherwise have bought at any given point in time), but causing the Alpha Funds to sell a materially increased ***volume*** of such options.  This practice would not have increased the incremental return on any given contract (the so-called "alpha return"), but the increased volume would have enabled the Alpha Funds to collect more "alpha" in the aggregate.  However, AllianzGI could only increase its writing (*i.e.*, selling) of such option contracts by selling them on margin, which, in turn, would materially increase the Alpha Funds' leverage and resulting risk exposure.

(b)     "Tightening" the Alpha Funds' profit zones by ***reducing*** the "spread" between the strategy's put and call options.  To illustrate this concept, the diagram below from AllianzGI's 2018 Investor Presentations represents an illustrative spread between the two aspects of the "short options-only" component of the Alpha Portfolio's alpha investment strategy, where (i) the short-call options are priced at 7% above the S&P 500 Index at inception; and (ii) the short-put options are priced at 12% below the S&P 500 Index at inception – resulting in a spread of 19%:



The resulting 19-point spread defines the boundaries of the "profit zone" for the "short-options-only" component of the "alpha" strategy in this example, because the strategy in this example will invariably make money for ***provided*** that the S&P 500 continues to trade "within the spread" (*i.e.*, in this example, between 2300 and 1890, corresponding to underlying changes in the S&P 500 Index ranging from +7% to -12%). "Tightening the spread," using this example, would involve reducing the top end of this range below 7% and/or increasing the lower end of this range above -12%.[18]

78.     By "tightening the spread," a given Alpha Fund could increase its incremental profits-per-option ***provided that*** market volatility remained relatively low.  For example, by "tightening" the spread by two percentage points on both ends, an Alpha Fund has the potential to achieve materially greater alpha from its options sales.  This is because, for example, a call option that is written based on a strike price that is only 5% "out of the money" can be sold for a higher

---

[18]     The chart reproduced above in this paragraph is taken from a 2018 Investor Presentation for the US Equity 500 Fund.  The analogous chart from a 2018 Investor Presentation for the 1000 Fund is substantively the same, except that it uses somewhat different illustrative numbers.

premium than a call option that is sold based on a strike price that is 7% "out of the money" (because buyers are willing to pay materially more for a call option that requires less volatility before it becomes "in the money").

79.     The same type of "tightening the spread" approach could be, and almost certainly was, applied to the "Directional Spread" portion of the alpha components of the Named Funds' (and the other Alpha Funds') investments beginning at some point in 2017.  As reflected in ¶65 above, the "Directional Spread" portions of these Alpha Funds' portfolios might be graphically illustrated as follows[19]:



To build on the illustration given in the immediately preceding paragraphs above, just as one can tighten the "core" profit zone of the core "Range-Bound Spread" portion of a portfolio (by two percentage points at both ends, to +5% and -10% in our example), one can correspondingly tighten

---

[19]     The chart reproduced below in this paragraph is taken from a 2018 Investor Presentation for the US Equity 500 Fund.  The analogous chart from a 2018 Investor Presentation for the 1000 Fund is substantively the same, except that it uses somewhat different illustrative numbers.

the next set of "spreads" that define the additional upside and downside "profit zones" created by the options comprising the "Directional Spread" portion of the Alpha Funds' alpha investments. For example, it would simply be a relatively simple matter for an options trader to create upside and downside "profit zones" that, unlike the (+6% to +9%) and (-6% to -16%) spreads shown in the above chart, would be defined by "tighter spreads" – and tighter corresponding upside and downside "profit zones" – of, for example, (+4% to +7%) and (-4% to -14%), respectively.

80.     But once again, there is "no free lunch" because materially tightening the spreads necessarily results in materially increasing this type of portfolio's risk profile.  In sum, tightening spreads means tightening the "profit zones," and tightening the "profit zones" means *increasing* the "loss zones."  Of equal or greater concern is the fact that doing so will also reduce the distance between (i) the portfolio's "center of gravity" (measured by reference to the level of the S&P 500 Index); and (ii) and the points in the "loss zone" where the portfolio would begin to suffer catastrophic losses.  In other words, given the leveraged nature of the Alpha Funds, each tightening of the spreads described above also raised the risk that a sharp and sustained decline in the S&P 500 Index would cause drastic losses that would dwarf the value of the offsetting gains (if any) on the Alpha Funds' "failsafe" long-put Hedging Positions.

## IV.     How AllianzGI's Dodging of a Bullet in 2018 Led It to Make Further (and Egregiously) False and Misleading Claims About the Alpha Funds' Investment and Risk Management Practices

81.     In late January and early February 2018, the low-volatility environment that had characterized 2017 and the first few weeks of 2018 was violently disrupted in a market event that would later come to be known as "Volmageddon."

82.     On Monday, February 5, 2018, the S&P 500 fell 4.1%, to 2648.94, from its closing level of 2762.13 on the prior Friday, February 2.  This decline also reflected a cumulative two-day decline of 6.1% since Thursday, February 1 (when the S&P 500 closed at 2821.98), and a one-

week decline of 7.8% since the end of trading on Friday, January 26 (when the S&P 500 closed at 2872.87).

83.     In addition, on February 5, 2018, the VIX jumped, rising from 17.31 to 37.32 – a 115.6% increase compared to the prior trading day.  The increase in the VIX on February 5 constituted the largest one-day percentage move since the current VIX calculation method was created in 2003.

84.     Over the next three trading days, the S&P 500 fell another 2.6% (to 2581.00 on February 8), representing a total four-trading-day decline (from the close on February 1 through the close on February 8) of 8.5%, and a nine-trading-day decline (from the close on January 26) of 10.2%.  However, the S&P 500 recovered roughly half of its losses from this nine-day period by February 15, 2018, when it closed at 2731.20.  The sharp increase in the VIX also reversed course after February 8, as it fell back over the next week of trading to roughly 19 at the close on February 15, 2018 (and representing roughly a 50% decline from its peak of 37.32).[20]

85.     These market events are illustrated in the chart below (the red line is the VIX and the white line is the S&P 500):

---

[20]     AllianzGI itself described VIX index levels between 18 and 25 as reflecting "mid-volatility" levels; it described VIX levels below 18 as reflecting "low volatility" and VIX levels greater than 25 as reflecting "high volatility."



86. Unlike a number of other funds that invested heavily in options, the Alpha Funds, including the Named Funds, escaped the so-called February 2018 "Volmageddon" event without suffering significant losses. As AllianzGI represented to the Named Funds' investors in its Client Commentary for the first quarter of 2018 – which was the first Client Commentary it circulated following the events of February 2018 – these Funds had "underperformed" (and in the case of the 1000 and 1000 Plus Funds, had actually "declined") "as equity markets underwent an abrupt shift from a smooth to a sharply whipsawing environment," which had made for a "challenging quarter." Nevertheless, AllianzGI further stated that it was "pleased" that the Named Funds were "able to limit the damage from this most recent market storm" – and affirmatively represented that "the first quarter [of 2018] was a clear demonstration of [the Named Funds'] *rigorous risk management*, [their] essential combination of short and long volatility, and the *resilience*" of the Named Funds' strategies. As further discussed below, however, such representations were materially false and misleading, as the reality was that, far from having "rigorous risk management," the Named Funds had actually dodged a bullet – and had done so only because the VIX and the S&P 500 had recovered to a significant extent so quickly (within roughly 10 days).

37

87.     In its Second Quarter 2018 Client Commentary, after the Named Funds had recouped their losses from the first quarter, AllianzGI further boasted that it was "pleased to have protected the [alpha] portfolio well during the turbulence" experienced in late January and early February 2018.

88.     During the last three quarters of 2018 and all of 2019, the VIX returned to its previous and relatively low levels.  Indeed, the VIX averaged only 15.83 over this period, with the fourth quarter of 2018 (when the VIX rose to as high as 36.07 before returning to its prior low levels) being the only exception to an overall period of low volatility.  In addition, with the exception of a short-lived downturn in the fourth quarter of 2018 (which was erased by the end of the following quarter), the S&P 500 traded steadily up during the same period, rising from 2641 at the end of the first quarter of 2018 to close at 3235 on December 30, 2019.

89.     As previously noted, however, during this same period, AllianzGI caused the Alpha Funds, including the Named Funds, to continue to engage in high risk "tightening the spreads" and "increasing leverage" practices.

90.     Nonetheless, AllianzGI continued to falsely assure investors that it would always place primary importance on its "rigorous risk management" and ensure that the Alpha Funds maintained – and would continue to maintain – a purportedly prudent "risk profile."  For example, as AllianzGI expressly represented to its investors in the Named Funds in its Third Quarter 2018 Client Commentary, "*we always prioritize preserving our risk profile*" and that, even when volatility is low, "*we still will not . . . [engage in] tightening our range-bound profit zones to collect more option premium [because] [t]o take on greater risk in a low-volatility environment would be <u>short-sighted and imprudent</u>*."  This statement was either an outright lie or sufficiently

reckless so as to constitute a flagrant disregard for the truth.   On information and belief, substantively identical representations were made to investors in the other Alpha Funds.

91.     In early 2020, in its Fourth Quarter 2019 Client Commentary – and in order to maintain its existing customer base and attract additional large investments (and resulting increased fee income) from both old and potentially new investors – AllianzGI made even more extravagantly false and misleading misrepresentations.   For example, AllianzGI represented that its investment strategies were so well managed and protected against sharp market disruptions that the Named Funds were actually positioned to **make** money and **reap higher profits** (rather than merely experience limited losses) in the event of "another February 2018-type move," and further represented that the Named Funds were "as prepared as ever in the event of a **_severe_** market dislocation."   As AllianzGI told its investors:

> Macro environment aside, **_today we are as prepared as ever in the event of a severe market dislocation. The obvious comparison is two years ago [i.e., February 2018]:_** Coming off a 22% gain in 2017, the S&P 500 defied expectations in January 2018 with an additional 6% rise that drove the VIX down to 10, but then in early February underwent a violent correction and volatility surge.
>
> While certainly we have no idea what lies ahead in the markets, **_we do believe [the Named Funds are] positioned for a strong improvement in the event of another February 2018-type move_**. Beyond the fact that we are building option positions at higher volatility levels than two years ago, **_the refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient_**. As a result, whether or not the current market conditions continue, we look forward in 2020 to pursuing risk-managed outperformance on our investors' behalf.

On information and belief, substantively identical representations were made to investors in the other Alpha Funds.

92.     As shown below, however, AllianzGI's representations that (among others) "we are as prepared as ever in the event of a severe market dislocation," that it believed that the Alpha Funds' portfolios were "**_positioned for a strong improvement in the event of another February_**

*2018-type move*," and that "the refinements we have implemented since [February 2018] . . . have made the option portfolio more resilient" were either outright lies or were sufficiently reckless so as to constitute a flagrant disregard for the truth.

**V.    The Alpha Funds Crash – and Suffer Catastrophic Losses that Should Have Been Avoided – Following Market Disruptions in the First Quarter of 2020 of the Type that Had Occurred in February 2018 and that AllianzGI Had Falsely Claimed the Alpha Funds Were Prepared For**

93.    Having boasted of its preparedness to withstand (and in fact profit from) a repeat of a "February 2018-type" scenario – namely a dramatic rise in the VIX and accompanying significant decline in the S&P 500 – beginning in late February 2020 AllianzGI and other investors were presented with that very type of scenario.

94.    More specifically, during the last week of February 2020, the VIX jumped from 17.08 at the close on Friday, February 21, 2020, to 40.11 on February 28 – representing an exceptionally large one-week increase of 134%.  During this same one-week period, the S&P 500 fell from 3337.75 to 2954.22, representing a sharp decline of 11.5%.  The S&P 500 then briefly rallied in early March 2020 – recouping nearly half of its losses and closing at 3130.12 on March 4.  But over the next eight trading days, from March 5 through March 16, the S&P 500 again traded down (closing at 2386.13 on March 16), equal to a further decline of 19.2% for the month and an overall decline of 28.5% since February 21.  Over the same period, the VIX's measure of volatility also rose, hitting 82.69 on March 16.

95.     The aforementioned market changes are illustrated in the chart below:



96.     Contrary to AllianzGI's representation and assurances, however, the Named Funds (and the other Alpha Funds) were not positioned to withstand (let alone profit from) such market movements.

97.     Instead, consistent with its practice of actually running the Alpha Funds in a manner that sacrificed prudent risk-management practices in the pursuit of maximizing its own "risk-reward" payoffs under its fee arrangements, AllianzGI flagrantly disregarded its investors' interests in preserving capital.  As a result, instead of the "strong improvement" in the Alpha Funds' performance that AllianzGI had promised in the event of "another February 2018-type move," by the end of March 2020, the value of the Alpha Funds – including the Named Funds – *collapsed.*  For example, the US Equity 500 Fund lost ***over 75%*** of its investors' money, or roughly $950 million in total, and the 1000 and 1000 Plus Funds suffered even greater percentage losses, with their investors losing all but pennies on the dollar – and by the summer of 2020 all three of these Funds (like all or most of the other Alpha Funds) were ***liquidated.***

98.     AllianzGI's abject failure in protecting the Alpha Funds against collapse was especially egregious here because AllianzGI had ample time over the course of late February and

the first half of March 2020 in which to prudently reduce leverage, regularly re-balance the Alpha Funds' (including the Named Funds') portfolios, and to build up their "back-stop" long put hedge positions.  As noted above, because of the depth and transparency of the options markets in which it invested the Alpha Funds' assets, AllianzGI had the ability, at any given point in time, to not only accurately determine the *current* value of its portfolio, but to accurately calculate what would happen to the value of that portfolio under any combination of changes in the relevant market value indices (notably the S&P 500) or volatility indices (notably the VIX) that it cared to model.  The market changes that transpired over the *several weeks* that it took for the relevant market value and volatility indices to reverse course during this February/March 2020 period were therefore *not* the kind of near-instantaneous events that might leave an options-trading investment manager insufficient time to reduce risk.  Indeed, even more so than was the case in early February 2018 two years earlier (when the relevant spikes occurred within the course of a single week), AllianzGI had plenty of time, as markets continued to move against the Named Funds (and the other Alpha Funds) – and continued to move closer to the downside edge of these Alpha Funds' overall "profit zones" – to reduce leverage, rebalance their "Alpha Portfolio," and otherwise reduce risk.

99.     However, as evidenced by the Alpha Funds' catastrophic performance, AllianzGI deliberately and recklessly (or at least negligently) – and contrary to its prior representations and in violation of its contractual and fiduciary duties to Plaintiffs and the other investors in the Named Funds' (and the other Alpha Funds) – failed to take meaningful steps to reduce those Alpha Funds' risk during late February and March 2020.  Instead, AllianzGI effectively chose to imprudently rely (as they had in February 2018) on a speedy reversal of adverse market trends (in the form of declining equity markets and increasing volatility) to avoid catastrophe.  In February 2018, despite its similar acts of misconduct and imprudence, AllianzGI had managed to "dodge the bullet" when

the market reversed course – but its inadequate risk controls and reliance on dumb luck in February 2018 (when they were bailed out by an exceptionally rapid and favorable change in the markets) was insufficient to allow it to dodge the same kind of bullet in early 2020.

100.    The Alpha Funds' "incentive allocation" fee structure – and in particular, their "cumulative high water mark" feature – incentivized AllianzGI to avoid taking the kinds of steps that were necessary to protect the Alpha Funds and reduce their risk exposure to reasonable and prudent levels as markets moved against them in the first quarter of 2020.  By early March 2020, the losses already sustained by the Alpha Funds' (including the Named Funds') investors meant that, at typical growth rates, it would be multiple quarters (or even years) before the value of any of these Alpha Funds would bounce back to their previous "high water marks" and allow AllianzGI to collect management fees again.  Acting to protect Alpha Fund investors by reducing leverage or purchasing increasingly expensive hedges would have only served to "lock in" these losses. Instead, AllianzGI chose to gamble (with its *investors'* money) that fate and a favorable change in the investment winds would put the various Alpha Funds' increasingly risky and disastrously exposed portfolios back into the profitable territory.  This strategy arguably maximized the chances that AllianzGI would be able to keep collecting lucrative incentive allocation fees from its investors going forward – unfortunately, it also maximized the chances that its "Structured Alpha" portfolios would suffer devastating losses that would leave its investors holding the bag.

## VI.    AllianzGI's Subsequent Efforts to Explain the Alpha Funds' Collapse Raise More Questions Than They Answer

101.    In early July 2020, AllianzGI circulated a document to investors in the Alpha Funds entitled "Structured Alpha March 2020 Performance."  That document (the "July 2020 Memo") purported to summarize the results of an "analysis" that AllianzGI had conducted to "better understand the sources of fund losses" that had been suffered in the first quarter of 2020.

According to AllianzGI, its "analysis" concluded that AllianzGI had managed its Structured Alpha Portfolio "in accordance with its design," and that the catastrophic losses suffered in March 2020 "were not the result of any failure in [AllianzGI's] investment strategy or risk management processes."[21]

102.    The July 2020 Memo further represented as follows:

*The Portfolio losses were the direct result of the speed, duration and severity of the market decline and attendant increase in volatility, which overtook the Portfolio Management team's portfolio restructuring process.* This restructuring process, which has been a cornerstone of the Structured Alpha products' alpha strategy since its inception in 2005, operated as described to investors and was implemented during this period as it was in past market downturns.

Since the inception of the Structured Alpha strategy, the Portfolio has held options positions grouped into three core strategies: (i) Range-Bound Spreads; (ii) Directional Spreads; and (iii) Hedging Positions. . . . *[T]he Hedging Positions play an important role in providing protection to the Portfolio against a sudden volatility increase and market shock. In the case of less dramatic market movements, the Portfolio's risk profile is primarily adjusted through the restructuring of the Range Bound Spreads and Directional Spreads.* The Portfolio Management team restructures by closing out of and then re-establishing the options in the Range Bound Spreads and Directional Spreads as the S&P 500 and other indices change.

\* \* \*

*The [Alpha Funds'] deep out-of-the-money Hedging Positions . . . are designed to act as a protective back-stop against sudden market shocks with volatility spikes. In the absence of a dramatic and sudden crash or spike, however, the Portfolio is exposed to potential losses when the market moves beyond the profit zones [established by the Alpha Funds' Range-Bound Spreads and Directional Spreads]. The Portfolio Management team addresses these exposures through restructuring.*

\* \* \*

---

[21]    The July 2020 Memo was drafted in terms of analyzing Allianz's overall "Structured Alpha Portfolio," which, as noted above, was comprised of not only the Named Funds, but the various other Alpha Funds.  Indeed, the entire July 2020 Memo was written in a manner that did not differentiate among the Alpha Funds, and one can thus infer that its statements about how the "Portfolio" was (allegedly) managed applied to all of Allianz's Alpha Funds (including the Named Funds).

As market stress increased, the risk exposure of the Portfolio was reduced by the systematic restructuring of the options positions.

103.    The July 2020 Memo then proceeded to discuss how AllianzGI's approach to risk management allegedly "utilized three lines of defense," consisting of (i) the "Portfolio Management teams"; (ii) "AllianzGI's independent Enterprise Risk Management and Compliance teams"; and (iii) the "Internal Audit function" of AllianzGI's affiliate, Allianz Asset Management ("AllianzAM").

104.    With respect to the purported operation of AllianzGI's "first line of defense," the July 2020 Memo stated:

> AllianzGI has at all times, including during February and March 2020, had in place risk mitigation approaches to offset a portion of losses or mitigate the risk inherent in earning alpha by selling options. In addition to a range of analytics that the Portfolio Management team employs in assessing the Portfolio's risk exposure, portfolio risk is mitigated by two approaches: (i) the Hedging Positions mentioned above (e.g., deep out-of-the-money S&P long puts); and (ii) the restructuring of the Range-Bound Spreads and Directional Spreads and other positions.

105.    With respect to the purported operation of AllianzGI's "second line of defense," the July 2020 Memo stated that its Enterprise Risk Management team purportedly ran "daily" "quantitative portfolio risk tests" that "focus[ed] on predictive indicators that assess how the Portfolio is positioned for defined, ***single day*** stresses, which are based on historically-viewed worst case scenarios."

106.    With respect to its "third line of defense," the July 2020 Memo simply stated: "[W]e can confirm that both the Structured Products Portfolio Management team and the Enterprise Risk Management team have been subject to AllianceAM Internal Audit reviews that were in part focused on portfolio risk within the standard audit cycle" and that "[t]hese audits resulted in no material findings."

A. **The July 2020 Memo's Incongruous Explanations for Why the Alpha Funds' Purported Hedging Strategies Failed**

107.    The July 2020 Memo's explanation of why AllianzGI's Structured Alpha Portfolio's hedging strategies failed to avert catastrophe in March 2020 were, however, incongruous and deeply troubling.

108.    First, AllianzGI now claimed, for the first time, that its "back-stop" Hedging Positions were intended to offer only "*some* protection in the case of a *very short-term market crash*." As the July 2020 memo now asserted:

> The Hedging Positions are designed to offer *some protection* in the case of a *very short-term market crash*. These positions are *not* intended to provide broader protection against all market downturns, *particularly downturns that transpire over longer periods of time*, and therefore would not offset substantially the losses from the Range Bound Spread positions.

109.    Remarkably, the July 2020 Memo then went on to clarify that, when AllianzGI stated that the Hedging Positions were designed to offer "some protection" in the case of a "very short-term market crash," AllianzGI was specifically equating a "very short-term market crash" to a ***one-day* crash.** As the July 2020 Memo stated:

> As noted above, the Hedging Positions are designed to provide protection to the Portfolio against a sudden market crash and volatility increase. ***Given that the market decline coupled with the surge in volatility was a multi-week move as opposed to a one-day shock***, the hedges in the form of S&P 500 long puts did not appreciate in value nearly enough to offset the losses in the core alpha-generating positions. The S&P 500 long puts were deliberately constructed with options that were both of relatively short expiration and far out of the money to protect against a ***one day* market shock**. Therefore, these puts did not appreciate as quickly in value as they might in the case of a sudden market crash. The value of the long puts increases with the increase in volatility and the long S&P 500 put positions were constructed to increase considerably in the case of a sudden surge in volatility to protect the portfolio. However, volatility in the recent period took several weeks to reach its peak in the middle of March, so legacy long puts had lost effectiveness due to time elapse, and more recent long puts had been relayered incrementally further out-of-the-money along with new short puts. ***This resulted in the Hedging Positions appreciating in value, but not enough to cover the losses.***

*Indeed, the July 2020 Memo conceded that the Alpha Funds' Hedging Positions had been all but useless in protecting "the Portfolio,"* as they contributed "gains of only 5%." By comparison, for example, the US Equity 500 Fund's overall performance in the March 2020 quarter (after taking into account the Hedging Position's' 5% gains) was a catastrophic loss of roughly 75%.

110.    As noted above, as a threshold matter, AllianzGI's statements regarding its purported hedging activities were jarring because AllianzGI had not previously disclosed to its investors that the Alpha Funds' (including the Named Funds') short-put hedging positions were designed only to hedge against "one-day shocks." For example, in the 2017 Due Diligence Materials, AllianzGI had affirmatively represented that the Alpha Funds' "tail-risk protection" included "*hedging not only for a single-day market crash, but also for a significant multi-day <u>or multi-week</u> decline*." Similarly, AllianzGI's 2018 Investor Presentations stated that the "primary objective" of the Alpha Funds' Hedging Positions was to "protect the [Alpha Funds]" from "a short-term equity-market crash," which it defined as "a decline of 10% to 15% in less than 5 days." Given that the 2018 Investor Presentations elsewhere described the Alpha Funds' Hedging Positions as being "[d]esigned to protect the portfolio in the event of a market crash," a reasonable investor would have understood that, although the Alpha Funds' Hedging Positions may have been designed *primarily* to protect against a crash that occurred over one to five days, they would *also* provide significant protection against more protracted crashes involving multi-week declines.

111.    Indeed, it would have been wildly imprudent and nonsensical for a portfolio like that of the Named Funds (or the other Alpha Funds) to be "deliberately constructed" to protect against "severe market disruptions" using options that would provide meaningful protection *only* against "one day crashes." Given that markets frequently "crash" over multiple days or weeks before hitting bottom, for these Alpha Funds to have had protection against only "one-day crashes"

makes about as much sense as buying insurance that covers only property damage suffered during the first 15 minutes of a fire, or that covers only accidents where the other vehicle is a sedan (but not an SUV or a truck).

112.     Similarly, if the representations of the July 2020 Memo concerning AllianzGI's "independent" Enterprise Risk Management function were true, AllianzGI's risk management systems were laughably inadequate because (according to the July 2020 Memo) they "focus[ed] on predictive indicators that assess how the portfolio is positioned for *defined, single day stresses,* which are based on historically-viewed worst case scenarios."  That AllianzGI's "independent" risk management oversight of the Portfolio Management team was, at any given time, focused on the Alpha Funds' risk over a time horizon that extended *only 24 hours into the future*, speaks for itself in terms of its (im)prudence and (in)adequacy.

113.     Moreover, even if AllianzGI had (contrary to fact) somehow disclosed that its Hedging Positions were designed to be effective only against "one-day crashes," the declines experienced in March 2020 *were* primarily composed of a series of significant "one-day shocks" that did not occur on consecutive days.  For example, on March 9, 2020, the S&P 500 Index dropped 7.6% (but rallied by 4.9% the next day); on March 12, the S&P 500 Index dropped 9.51% (but rallied the next trading day by 9.3%); and on March 16, the S&P 500 Index dropped almost 12% (but rallied the next day by 6.0%).  Accordingly, even if the Alpha Funds' hedging strategies had been designed to provide protection *only* against "one-day shocks," AllianzGI's July 2020 Memo would *still* fail to explain why these hedging strategies failed to protect the Alpha Funds against catastrophe in March 2020.

114.     The July 2020 Memo also failed to explain why – despite AllianzGI having affirmatively represented, as recently as January 2020, that the Alpha Funds were "*positioned for*

*a <u>strong improvement</u> in the event of another February 2018-type move*" – the Alpha Funds'
value *collapsed* in the first quarter of 2020.  In particular, the last week of February 2020 (when
the VIX jumped to 40.11 and the S&P 500 fell 11.5%) replicated to an uncanny degree the events
of early February 2018 (when the VIX jumped to 37.32 and the S&P 500 fell 8.5% over four days
and 10.0% over nine days).  Accordingly, the Alpha Funds (including the Named Funds) should
have been in a *stronger* position by the end of February 2020 than they had been a week earlier at
the start of the crash.  Yet the July 2020 Memo nowhere explains why AllianzGI was somehow
unable, or unwilling, to reinvest profits amassed in late February 2020 into the acquisition of *new*
Hedging Positions that could similarly protect the Alpha Funds against the further shocks that
would be experienced beginning on March 5.  In such circumstances, the July 2020 Memo's
statement that "volatility in the recent [late February to mid-March 2020] period took *several
weeks* to reach its peak in the middle of March, so legacy long puts had lost effectiveness due to
time elapse," simply begs the question of why – particularly given the brief recovery the S&P 500
experienced over the first three trading days of March 2020 (March 1 to March 3) – AllianzGI did
not adjust its long put Hedging Positions so that the Alpha Funds (including the Named Funds)
would have been protected against the renewed string of further market declines (including some
sharp one-day declines) that would occur over the next nine trading days (March 4 to 16).

115.    The July 2020 Memo appears to have anticipated this question, but once again,
AllianzGI's "answers" (even if accepted as true) simply provide additional grounds for finding
that it acted with deliberate, reckless, or (at best) negligent indifference towards protecting the
value of the Alpha Funds in the face of a market crash.  Specifically, the July 2020 Memo first
sought to deflect away from the inadequacy of the Alpha Funds' *Hedging Positions* by stating as
follows:

> *The risks posed by market downturns such as February-March 2020 are primarily addressed by the restructuring of options positions*. Restructuring is a process of risk of risk mitigation by which the Portfolio Management team adjusts the Portfolio to market moves by closing out a portion of the options that serve as the Portfolio's core alpha generators [*i.e.*, the Range-Bound Spread and Directional Spread options] *and replacing them with new positions with strike prices further out of the money*, for example. Over the years, restructuring has served as a vital component of the Portfolio Management team's risk mitigation process, allowing the Portfolio to dynamically manage risk while still pursuing its funds' respective stated alpha targets – a process that has been explained at length to all investors.

116.    The July 2020 Memo then tried to argue that appropriate "restructuring" efforts were undertaken.  More specifically, the July 2020 Memo stated as follows:

**The recent market downturn**

> Restructuring [of the Alpha Funds] had historically been relatively limited as a percentage of total Portfolio positions. However, as equity markets declined and volatility increased into March 2020, per the strategy's design, the portfolio managers implemented multiple rounds of restructuring trades.[22] For example, as markets declined the Portfolio Management team replaced near-to-the-money short S&P 500 puts and short NASDAQ puts with new short puts struck at prices further away from then-current market levels. While re-establishing alpha-generating positions at lower strike prices, this resulted in realized losses on the near-to-the-money short puts. . . .  In some instances, this restructuring was repeated on subsequent days on legacy positions and on positions that represented the new restructured legs. Despite these steps, the Portfolio ultimately could not be restructured quickly enough to keep pace with the market decline, resulting in additional losses.

117.    Yet the July 2020 Memo conspicuously failed to explain *why*, if AllianzGI had, in fact, acted prudently and appropriately, AllianzGI had nonetheless failed to prevent the Alpha Funds (including the Named Funds) from suffering catastrophic losses.  In particular, Plaintiffs' consulting experts believe there is no reasonable basis for a finding that "the Portfolio could not have been restructured quickly enough" to avoid the kinds of catastrophic losses that the Alpha Funds ultimately suffered.  This is primarily because (i) the market decline that occurred between February 21 and March 23, 2020, though severe, played out over a month-long period; (ii) the

---

[22]    The July 2020 Memo referenced four instances of "restructuring" of the Structured Alpha 1000 fund, which AllianzGI claimed occurred on March 4, 6, 12, and 13, 2020.

market for buying and selling options on the S&P 500 continued to function normally throughout this period, and to process heavy trading volume of these instruments in a highly efficient manner and at prices that were consistent with standard industry models and algorithms for pricing such instruments; and (iii) there was simply no excuse for AllianzGI – in an era of modern computers, exceptionally efficient and liquid S&P 500 options markets, and the ability to accurately calculate the value of any given option contract at any given future point in time (based on whatever combination of pricing and volatility assumptions that one might care to model) – not to have appreciated, in real time, the extent to which the Alpha Funds' portfolios were falling materially "out of balance."

118.     In sum, AllianzGI either knew, or should have known, at all relevant times, the S&P 500-level around which the Alpha Funds' "Range Bound" and "Directional" spread strategies were centered; whether and to what extent the market had moved towards the "downside" boundary of the Alpha Funds' "profit zones"; what trades it needed to execute to "re-center" the Alpha Funds' portfolios in response to changes in the level of the S&P 500; and how relatively far – or how relatively little – markets would have to continue to move in an adverse direction before the Alpha Funds would suffer losses, and ultimately *catastrophic* losses.  Although markets may have moved too quickly and too adversely to prevent the Alpha Funds from suffering *any* losses during the February/March 2020 upheavals, there was simply no excuse for AllianzGI's failure to take timely, appropriate, prudent, and *adequate* restructuring of its Range Bound, Directional Spread, and Hedging Positions so as to protect the Alpha Funds from anything close to the kind of catastrophic losses that they actually suffered during this period.

119.     This conclusion is further reinforced by the fact that although numerous non-AllianzGI hedge funds have options-based investment strategies that are fundamentally similar to

those that AllianzGI purported to follow, none of those other funds suffered losses of remotely the same magnitude that the Alpha Funds did during the February/March 2020 period.

120.     Whether AllianzGI actually took *any* steps to mitigate the Alpha Funds' risk, as described in AllianzGI's July 2020 Memo, remains to be determined following discovery.  As set forth above, however, whatever steps it did take were patently inadequate, its risk-management policies and practices were laughably deficient, and its culpable acts and omissions, as alleged herein, were committed knowingly, recklessly, or (at best) negligently and in breach of AllianzGI's fiduciary and contractual duties to Plaintiffs and the Class.[23]

## CLASS ACTION ALLEGATIONS

121.     Plaintiffs bring this action as a class action on behalf of all persons and entities who purchased or otherwise acquired, directly or indirectly, limited liability company interests in the US Equity 250 Fund, the US Equity 500 Fund, the Global Equity 350 Fund, the Global Equity 500 Fund, the US Fixed Income 125 Fund, the US Fixed Income 250 Fund, the 500 Fund, the 1000 Fund, or the 1000 Plus Fund at any time and who held those interests through March 31, 2020 (the "Class").  Excluded from the Class are AllianzGI and its officers, directors, employees, affiliates, legal representatives, predecessors, successors, and assigns, and any entity in which it has a controlling interest or is a parent.

---

[23]     The July 2020 Memo also disclosed that of the losses suffered by the 1000 Fund, roughly 67% of those losses "were caused by S&P 500 put options" and roughly 25% of the losses "were caused by short VIX and VXX options." Without discovery, Plaintiffs are not in a position to determine the extent to which the Alpha Funds' losses were exacerbated by AllianzGI's imprudent or reckless management of any VIX and/or VXX options (which are generally more volatile, and risky, than S&P 500-based options).  In any event, it can be reasonably inferred from the July 2020 Memo that the clear bulk of the massive losses suffered by the Alpha Funds resulted from losses on its S&P 500 options trades – and that the Alpha Funds' long-put "Hedging Positions" were not remotely sufficient to protect the Alpha Funds.  *See* July 2020 Memo at 4 (noting, with considerable understatement, that the losses suffered in the Structured Alpha 1000 fund were only "partially offset by gains generated by the fund's protective S&P 500 long puts . . . which contributed gains of approximately *5%*, modestly offsetting losses").

122.    The members of the Class are so numerous that joinder of all members is impracticable.  Although the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that the number of Class members numbers in the hundreds and that joinder would be impracticable.  Members of the Class may be identified from records maintained by AllianzGI and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in other securities-related class actions.

123.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact that are common include:

(a)      Whether AllianzGI breached its common fiduciary duties to the members of the Class;

(b)      Whether AllianzGI breached its common contractual obligations to the members of the Class, as set forth in the Offering Documents;

(c)      Whether AllianzGI breached its implied duty of good faith and fair dealing to the members of the Class;

(d)      Whether AllianzGI managed the Alpha Funds in a negligent manner;

(e)      Whether AllianzGI's common statements in its PPMs, quarterly Client Commentaries to Class members, and investor presentations were materially false and misleading;

(f)      Whether AllianzGI's common misstatements or omissions to members of the Class were made negligently, or with knowledge of or reckless disregard for the truth;

(g)      Whether AllianzGI's conduct constituted a breach of its fiduciary and related duties under ERISA;

(h)      Whether AllianzGI engaged in prohibited transactions under ERISA; and

(i)      To what extent Class members have suffered damages, and the proper measure of damages.

124.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by AllianzGI's wrongful conduct as complained of herein.

125.    Plaintiffs are institutional investors that will fairly and adequately protect the interests of the members of the Class and have retained counsel that is highly skilled and experienced in complex class and securities litigation.  Plaintiffs have no interests that are in conflict with or otherwise antagonistic to the interests of the other Class members.

126.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

127.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.  This claim is asserted on behalf of Plaintiffs and all members of the Class to the extent that their claims under this cause of action are not pre-empted by ERISA.

128.    AllianzGI, as Managing Member of the Alpha Funds, owed fiduciary duties to the Alpha Funds' investors, including Plaintiffs and Class members.

129.    In addition, the Offering Documents for each Alpha Fund appointed AllianzGI as representative and attorney-in-fact for Plaintiffs and the Class members with respect to the

respective Alpha Funds, a designation that imposed the fiduciary duty of loyalty on the attorney-in-fact.

130.    AllianzGI had an obligation to carry out its fiduciary duties with respect to the Alpha Funds with the care, skill, prudence, and diligence under the circumstances then-prevailing that a prudent person acting in a like capacity, and with experience and familiarity with options trading, portfolio strategy, and market risks, would use in a similar situation.  Here, that meant that AllianzGI was required, among other things, to have the trading sophistication and proficiency to reasonably protect each Fund's assets in a wide range of market conditions, including those that existed in February and March 2020, and to prudently respond in the face of adverse market changes.

131.    AllianzGI breached these fiduciary duties by causing the Alpha Funds to increase their leverage and tighten their spreads in order to maximize their potential alpha returns (thereby increasing the fees paid to AllianzGI from Fund assets), at the expense of appropriate risk management and the interests of Plaintiffs and the other members of the Class.

132.    AllianzGI further breached its fiduciary duties by effectively abandoning any meaningful efforts to implement and maintain the hedging strategy that it was supposed to have in place, or to implement any other prudent risk protections, thereby exposing the Alpha Funds to catastrophic (but readily avoidable) losses.

133.    AllianzGI further breached its fiduciary duties by concealing material information from Plaintiffs and Class members, including (i) its disregard or abandonment of the Alpha Funds' strategy and risk controls as set forth in the Offering Documents for each Alpha Fund; (ii) its causing the Alpha Funds to imprudently increase their leverage and "tighten their spreads" at the expense of proper risk controls; and (iii) that AllianzGI's conduct was in pursuit of its own

financial interests and at the expense of the best interests of Plaintiffs and the other members of the Class.

134.    AllianzGI further breached its fiduciary duties when, during February and March 2020, it failed to take meaningful steps to protect the Alpha Funds in that, for example and most conspicuously, it failed to act prudently to timely and adequately restructure the Alpha Funds' options positions and to meaningfully increase the Alpha Funds' Hedging Positions in reasonably protective "long put" positions.  As market conditions worsened in the first quarter of 2020, AllianzGI was increasingly motivated to commit such breaches because AllianzGI would likely have been unable to earn any fees from Plaintiffs or Class members for the foreseeable future if it had acted prudently to exit and restructure losing options positions and caused the Alpha Funds to incur the costs of restructuring their Hedging Positions – whereas the reckless alternative of relying on a speedy reversal of adverse market movements to avoid catastrophe (while plainly not in the best interests of Plaintiffs or the other members of the Class) offered AllianzGI the greater likelihood of being able to continue to receive lucrative "incentive allocation" fees from Alpha Fund investors (and to avoid locking in losses that would trigger "high water mark" fee provisions that were highly adverse to AllianzGI's financial interests).

135.    As a direct and proximate result of the acts and omissions of AllianzGI, as set forth above, Plaintiffs and the members of the Class have sustained actual damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**(Breach of Contract)**

136.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.  This claim is asserted on behalf of Plaintiffs and all members of the Class to the extent that their claims under this cause of action are not pre-empted by ERISA.

137.   As described above, the Offering Documents, including the Subscription Agreement, LLC Agreement, and PPM for each Alpha Funds, constitute valid and binding contracts that are enforceable against AllianzGI.

138.   Each LLC Agreement required AllianzGI to invest each Alpha Fund's assets in accordance with the terms of the relevant PPM and the investment strategies set forth therein.

139.   Each PPM represented that the Alpha Funds, as managed by AllianzGI, would employ investment strategies that included the use of appropriate hedging strategies and strict risk controls to limit risk and preserve capital.

140.   AllianzGI breached the agreements set forth in the Offering Documents for each Alpha Fund by not investing the financial capital provided by Plaintiffs and Class Members in accordance with the promised investment strategy, as set forth above and as evidenced by the Alpha Funds' catastrophic collapse in value in March 2020.

141.   The LLC Agreement for each Alpha Fund provided that AllianzGI would be liable to that Fund's investors for "any acts or omissions arising out of or in connection with the [Fund]" that are "made in bad faith" or that constitute "willful misconduct or negligence."

142.   Further, the PPM for each Alpha Fund provided that AllianzGI would "use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA," which meant that AllianzGI would "be required to exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

143.   AllianzGI breached its contractual agreements with Plaintiffs and the other members of the Class, as embodied in the Offering Documents for each Alpha Fund, by failing to

manage that Fund prudently, including through, among other things: (i) AllianzGI's imprudent use of increased leverage and "tightening of spreads" in pursuit of increased incentive fees; (ii) its failure to implement and adhere to reasonable or prudent risk management controls and practices; and (iii) its failure to take meaningful steps to protect the Alpha Funds prior to and during the February to March 2020 period to timely and adequately restructure the Alpha Funds' options positions, and to meaningfully increase the Alpha Funds' Hedging Positions in reasonably protective "long put" positions, as markets moved adversely to the Alpha Funds' overall portfolio.

144.   To the extent that the Bricklayers Fund and certain other members of the class invested in the Alpha Funds through the Marco Trust, the Bricklayers Fund and such other members of the class were intended third-party beneficiaries of the Subscription Agreement, LLC Agreement, and PPM for each Alpha Fund that was entered into by the Marco Trust for the benefit of such parties.

145.   Plaintiffs and the Class have suffered damages as a result of these breaches of the Offering Documents in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Duty of Good Faith and Fair Dealing)**

146.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.  This claim is asserted on behalf of Plaintiffs and all members of the Class to the extent that their claims under this cause of action are not pre-empted by ERISA.

147.   To the extent that AllianzGI's acts and omissions, as alleged above, did not constitute breaches of its substantially identical contractual obligations to Plaintiffs and the other members of the Class under the Offering Documents, AllianzGI's acts and omissions breached its implied duties of good faith and fair dealing to Plaintiffs and the other members of the Class.

148.     For example, AllianzGI breached its duties of good faith and fair dealing by, among other things, knowingly and recklessly exposing each Alpha Fund and its investors to significant risk of catastrophic loss, and by abandoning the kind of prudent risk controls and hedging strategies that any reasonable investor (or reasonable fund manager) would have understood to be in place for an options-based fund of the type that each Alpha Fund purported to be.

149.     AllianzGI's culpable acts and omissions in failing to prudently manage the Alpha Funds and adhere to reasonable risk-management and hedging strategies were impliedly proscribed by the terms of the Offering Documents for each Fund.  Moreover, AllianzGI's culpable acts and omissions, as alleged above, were not taken in good faith, but were instead motivated by AllianzGI's financial interest in trying to maximize its receipt of incentive fees from each Alpha Fund (and, in March 2020, to avoid locking in losses that would trigger "high water mark" fee provisions that were highly adverse to AllianzGI's financial interests).

150.     As a result of AllianzGI's breaches of its implied duties of good faith and fair dealing, Plaintiffs and the other members of the Class have suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Negligence)

151.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.  This claim is asserted on behalf of Plaintiffs and all members of the Class to the extent that their claims under this cause of action are not pre-empted by ERISA.

152.     As Managing Member of each Alpha Fund, AllianzGI owed a duty of care to Plaintiffs and the Class members based on the special relationship, or "privity," arising out of the Offering Documents.

153.    In addition, each PPM expressly provided that AllianzGI was "responsible for the general management of the investment portfolios of the [relevant Alpha] Fund under the Operating Agreement."

154.    The LLC Agreement further provided that AllianzGI would be liable to the investors in each Alpha Fund for "any acts or omissions arising out of or in connection with the [relevant Alpha Fund]" that were "made in bad faith" or that constituted "willful misconduct or negligence."

155.    AllianzGI breached its duty to Plaintiffs and Class members by failing to exercise reasonable care in properly protecting each Alpha Fund against a severe market downturn of the type that caused the value of each of the Alpha Funds' portfolios to collapse in March 2020.

156.    For example, AllianzGI breached its duty of care to Plaintiffs and the other members of the Class by failing to manage the Alpha Funds prudently through, among other things: (i) AllianzGI's use of imprudently increased leverage and "tightening of spreads"; (ii) its failure to implement and adhere to reasonable or prudent risk management controls and practices; (iii) its failure to take meaningful steps to protect the Alpha Funds prior to and during the February to March 2020 period to timely and adequately restructure the Alpha Funds' options positions and meaningfully increase the Alpha Funds' Hedging Positions in reasonably protective "long put" positions, as markets moved adversely to the Alpha Funds' overall portfolios; and (iv) taking these and other actions in order to maximize AllianzGI's own financial interests (by maximizing its ability to continue to collect lucrative fees from Plaintiffs and other Class members and avoid contractual "high water mark" provisions) at the expense of the interests of Plaintiffs and the Class.

157.    As a result of AllianzGI's negligence, Plaintiffs and the other members of the Class have suffered damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Violation of Section 404(a)(1)(B) of ERISA)**

158.    The Teamsters BOT and the Bricklayers BOT incorporate the foregoing allegations as if fully set forth herein.  This claim is asserted on behalf of all members of the Class (including their named fiduciaries) that are employee benefit plans or otherwise subject to ERISA.

159.    The Teamsters BOT and the Bricklayers BOT bring this claim on behalf of all members of the Class (including their named fiduciaries) that are employee benefit plans or otherwise subject to ERISA under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a), (a)(3), and 1109(a)).

160.    Section 404(a)(1)(B) of ERISA states that "a fiduciary shall discharge his[/her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

161.    AllianzGI agreed in the PPMs for each Alpha Fund that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA."

162.    AllianzGI agreed in the LLC Agreements for each Alpha Fund that "to the extent that the underlying assets of the [Fund] constitute 'plan assets' within the meaning of ERISA," AllianzGI "shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."  ERISA's standard of care requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

163.    Similarly, AllianzGI agreed, by letter agreement with the Marco Trust (the vehicle through which the Bricklayers Fund and certain other members of the Class invested in certain Alpha Funds), that "for such times as the assets of the [relevant] Fund are treated as 'plan assets' for purposes of [ERISA], the Trust designates [AllianzGI] to act as 'investment manager' (as defined in Section 3(38) of ERISA) with respect to its assets invested in the Fund."  AllianzGI also represented and warranted that, "at such times as the assets of the [relevant Alpha] Fund are treated as 'plan assets' for purposes of ERISA, it shall be an 'investment manager' and a 'fiduciary' (as defined in section 3(21) of ERISA)."  AllianzGI also "acknowledge[ed] and accept[ed] its appointment as an 'investment manager' and 'fiduciary' with respect to the Trust's assets that are invested in the Fund."

164.    AllianzGI violated its duty of prudent care by failing to act as a prudent fiduciary would in like circumstances.  Specifically, AllianzGI:

(a) caused the Alpha Funds to increase their leverage and tighten their spreads in order to maximize their potential alpha returns (thereby increasing the fees paid to AllianzGI from Fund assets), at the expense of appropriate risk management and the interests of the Teamsters Fund, the Bricklayers Fund, and the other members of the Class;

(b) effectively abandoned any meaningful efforts to implement and maintain the hedging strategy that it was supposed to have in place, or to implement any other prudent risk protections, thereby exposing the Alpha Funds to catastrophic (but readily avoidable) losses;

(c)  concealed material information from the Teamsters Fund, the Bricklayers Fund, and Class members, including (i) its disregard or abandonment of the Alpha Funds' strategy and risk controls as set forth in the Offering Documents for each Alpha Fund; (ii) its causing the Alpha Funds to imprudently increase their leverage and "tighten their spreads" at the expense of proper risk controls; and (iii) that its conduct was in pursuit of its own financial interests and at the expense of the best interests of Plaintiffs and the other members of the Class.

(d)  failed, during February and March 2020, to take meaningful steps to protect the Alpha Funds in that, for example and most conspicuously, it failed to act prudently to timely and adequately restructure the Alpha Funds' options positions and to meaningfully increase the Alpha Funds' Hedging Positions in reasonably protective "long put" positions.

165.    As a direct result of AllianzGI's violation of § 404(a)(1)(B) of ERISA, the Teamsters Fund, the Bricklayers Fund, and the other members of the Class that are employee benefit plans or otherwise subject to ERISA suffered actual damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
#### (Violation of Section 406 of ERISA)

166.    The Teamsters BOT and the Bricklayers BOT incorporate the foregoing allegations as if fully set forth herein.  This claim is asserted on behalf of all members of the Class (including their named fiduciaries) that are employee benefit plans or otherwise subject to ERISA.

167.    The Teamsters BOT and the Bricklayers BOT bring this claim under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a), (a)(3), and 1109(a)).

168.    Under ERISA § 406(b) (29 U.S.C. § 1106(b)), a fiduciary may not engage in certain prohibited transactions.  This includes a requirement that a fiduciary "shall not deal with the assets of the plan in his own interest or for his own account."

169.    AllianzGI violated ERISA § 406(b) by, among other things, managing assets of the Teamsters Fund and the Bricklayers Fund in its own self-interest and not for the exclusive purpose of providing benefits to the Teamsters Fund's and the Bricklayers Fund's participants and beneficiaries.

170.    As a direct result of AllianzGI's violation of ERISA § 406(b), the Teamsters Fund, the Bricklayers Fund, and the other members of the Class that are employee benefit plans or otherwise subject to ERISA suffered actual damages in an amount to be determined at trial. AllianzGI's violations also caused it to wrongfully collect substantial fees and other consideration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand relief as follows:

A.    An order certifying this action as a class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    A judgment awarding actual damages in favor of Plaintiffs and the Class against AllianzGI in an amount to be proven at trial, including interest thereon to the maximum extent permitted by law;

C.    A judgment awarding punitive damages in favor of Plaintiffs and the Class against AllianzGI in an amount to be determined at trial;

D.    A judgment awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees;

E.    Disgorgement of all fees and other consideration collected by AllianzGI in connection with their violation of ERISA's prohibited-transactions provisions; and

F.      Such other and further relief this Court considers just and proper.

DATED:  December 23, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 */s/* William C. Fredericks
William C. Fredericks
Donald A. Broggi
Zachary M. Vaughan
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
zvaughan@scott-scott.com

*Attorneys for Plaintiffs*